Ellen V. Leonida, Esq. (SBN: 184194)
   leonida@braunhagey.com
Matthew Borden, Esq. (SBN: 214323)
   borden@braunhagey.com
Amy W. Senia, Esq. (SBN: 329134)
   senia@braunhagey.com
BRAUNHAGEY & BORDEN LLP
351 California Street, 10th Floor
San Francisco, CA 94104
Telephone: (415) 599-0210
Facsimile: (415) 276-1808

Catherine Sweetser, Esq. (SBN: 271142)
   sweetser@law.ucla.edu
Rie Ohta, Esq. (SBN: 329746)
   ohta@law.ucla.edu
UCLA LAW CLINICS
UCLA SCHOOL OF LAW
385 Charles E. Young Drive East
Los Angeles, CA 90095
Telephone: 310-267-5068

ATTORNEYS FOR PLAINTIFF
CARLOS MURILLO VEGA

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CARLOS MURILLO VEGA,<br><br>        Plaintiff,<br><br>     v.<br><br>MANAGEMENT AND TRAINING CORPORATION,<br><br>        Defendant. | Case No. **'21 CV 1770 GPC MDD**<br><br>**COMPLAINT FOR:**<br><br>  1) **Violation of Cal. Gov. Code Section 7320;**<br>  2) **Negligence;**<br>  3) **Intentional Infliction of Emotional Distress**<br><br>**JURY TRIAL DEMANDED** |

1   Bree Bernwanger, Esq. (SBN: 331731)
      bbernwanger@lccrsf.org
2   LAWYERS' COMMITTEE FOR CIVIL RIGHTS
    OF THE SAN FRANCISCO BAY AREA
3   131 Steuart Street, Suite 400
    San Francisco, CA 94105
4   Telephone: (415) 543-9444
    Facsimile: (415) 543-0296
5   (S.D. Cal. Admission Pending)

6   Lisa V. Knox, Esq. (SBN: 279406)
      lisa@ccijustice.org
7   CALIFORNIA COLLABORATIVE
    FOR IMMIGRANT JUSTICE
8   1999 Harrison Street, Suite 1800
    Oakland, CA 94610
9   Telephone: (415) 684-4783
    Facsimile: (415) 840-0046

10

11  ATTORNEYS FOR PLAINTIFF
    CARLOS MURILLO VEGA
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Plaintiff Carlos Murillo Vega alleges as follows:

**<u>INTRODUCTION</u>**

1.      Plaintiff Carlos Murillo is a United States citizen who was "civilly" incarcerated for fourteen months at a for-profit detention facility because immigration authorities alleged that he is deportable.

2.      Defendant Management and Training Corporation ("MTC") is a private corporation that traffics in human captivity for profit. Pursuant to a contract with U.S. Immigration & Customs Enforcement ("ICE"), it operates the Imperial Regional Detention Facility ("Imperial" or the "Facility") where Mr. Murillo was held.

3.      MTC confined Mr. Murillo to a jail cell so small that he could almost touch both walls. He spent twenty-three hours a day alone in that cell for fourteen months. MTC held Mr. Murillo in solitary confinement in contravention of federal detention standards, and the contract it had signed with ICE; this was not a disciplinary measure, nor was it justified in any way.

4.      Solitary confinement is a form of torture. Multiple studies have found that it causes severe psychological harm, including anxiety, withdrawal, cognitive dysfunction, rage, hopelessness, depression, suicidal ideation and behavior, and emotional breakdown. International standards limit this type of confinement to a maximum of fifteen days. Here, Mr. Murillo was held for over a year. Imprisoning Mr. Murillo in this manner was unnecessary for his protection or anyone else's and violated multiple standards of care that MTC was contractually obligated to follow. It served no legitimate custodial goal.

5.      For-profit prison companies such as MTC purposefully under-resource detention facilities, creating cesspools of suffering that generate millions of dollars in profits with little accountability or oversight. In 2020, the California Legislature enacted A.B. 3228, the Accountability in Detention Act, now codified at California Government Code section 7320, to hold private prison corporations responsible for

1
COMPLAINT

1  the health and safety of those in their custody. Among other things, this law provides
2  that if a private prison violates the terms of its contract with the government, the
3  victim may bring a civil action against the private prison for damages.

4      6.     Mr. Murillo brings this action pursuant to Government Code section
5  7320 to hold MTC accountable for locking him in solitary confinement for fourteen
6  months in violation of its contract with ICE, and to compensate him for the lasting
7  physical and mental harm that MTC's tortious conduct inflicted on him.

8                              **JURISDICTION AND VENUE**

9      7.     The Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332
10  because Plaintiff and Defendant are citizens of different states, and the amount in
11  controversy exceeds $75,000.

12     8.     Plaintiff Carlos Murillo is a resident of California.

13     9.     Defendant Management & Training Corporation is incorporated in
14  Delaware and headquartered in Utah.

15     10.    Venue is proper in this District under 28 U.S.C. § 1391 and 15 U.S.C.
16  § 22, because a "substantial part of the events or omissions" on which the claim is
17  based occurred in this District.

18                                  **THE PARTIES**

19     11.    From December 2019 to February 2021, Plaintiff Carlos Murillo was
20  detained in a Special Management Unit, a form of solitary confinement, at Imperial
21  Regional Detention Facility in Calexico, California.

22     12.    Defendant Management & Training Corporation is a for-profit
23  corporation that conducts business in California. The majority of MTC's business is
24  as a private prison contractor. In addition to operating the Imperial Regional
25  Detention Facility, MTC also has contracts to operate four other detention centers,
26  twenty-one correctional facilities, and a probation and parole program. MTC is the
27  third-largest for-profit prison company in the U.S., and also does business in Puerto
28  Rico, Egypt, and the United Kingdom. MTC has an annual revenue of over two

billion dollars. All MTC employees were acting within the scope of their employment at all times relevant to this Complaint.

## FACTS

**I.**  **DEFENDANT KEPT MR. MURILLO IN SOLITARY CONFINEMENT FOR FOURTEEN MONTHS WITHOUT JUSTIFICATION, IN VIOLATION OF ITS CONTRACT WITH THE GOVERNMENT**

**A.**  **Defendants Isolated Mr. Murillo in Solitary Confinement Without Justification**

13.  On December 13, 2019, Mr. Murillo was taken into to ICE custody. Mr. Murillo, who grew up in Imperial County, California, is a United States citizen through his father, a U.S.-born military veteran. When ICE arrested Mr. Murillo, he did not understand immigration law and had not yet obtained the necessary documents to prove his United States citizenship.

14.  ICE sent Mr. Murillo to Imperial, a detention facility run by MTC, a for-profit company that contracts with ICE to imprison people whose immigration status in the United States is contested. As part of MTC's contract with ICE, it is required to follow ICE's Performance-Based National Detention Standards ("PBNDS").[1] The PBNDS establish the minimum requirements for treatment of people in ICE custody.

15.  Among the standards dictated by the PBNDS are the limited circumstances under which people may be placed in solitary confinement in a Special Management Unit ("SMU"). The PBNDS provide for two types of solitary confinement: (1) disciplinary segregation (when there is a need to separate the person from the general population for disciplinary reasons), and (2) administrative segregation (when a person "represents an immediate, significant threat to safety,

---

[1] The PBNDS applicable at the time of Mr. Murillo's incarceration are the 2011 PBNDS and 2016 addendum. *See* U.S. Imm. and Customs Enf't, *Performance-Based National Detention Standards 2011* (Revised Dec. 2016), https://www.ice.gov/doclib/detention-standards/2011/pbnds2011r2016.pdf. The portions relevant to Mr. Murillo's claims are found in section 2.12 of the PBNDS, which are attached as Exhibit A.

3

COMPLAINT

security or good order").[2] In limited circumstances, the PBNDS allow detention facilities to use solitary confinement (*i.e.*, administrative segregation) as a means of "protective custody." Those circumstances exist "only when there is documentation and supervisory approval that [administrative segregation] is necessary to protect a detainee from harm and that no reasonable alternatives are available."[3] Detainees under protective custody in the SMU must be given access to the same programs and services that detainees in general population enjoy, to the maximum extent possible.[4]

16.     Upon Mr. Murillo's arrival at Imperial, an MTC employee gave Mr. Murillo a choice regarding where he wanted to be housed: general population or protective custody. The MTC employee told Mr. Murillo that general population was dangerous and that he would be safer in protective custody. Mr. Murillo, grateful for the advice and confident that his citizenship status would soon be sorted out, accepted the offer of protection. He was completely unprepared for what this "protection" entailed.

17.     What followed was a Kafkaesque nightmare of isolation, abuse, and callous disregard for Mr. Murillo's physical and mental health. At Imperial, detainees in general population live in a dormitory and have access to a recreation yard. They can socialize with each other and take advantage of recreational activities, religious programming, the library, and other services. People in "protective custody" are housed in the administrative segregation section of the SMU, which is solitary confinement. Detainees in administrative segregation spend twenty-three hours a day alone in a cell. Their access to the yard, the library, other detainees, and even the showers is severely limited or nonexistent. Mr. Murillo was not informed of these restrictive conditions before he agreed to "protective custody."

---

[2] Ex. A at 171 (PBNDS § 2.12(II)(3)).
[3] *Id.* (PBNDS § 2.12(II)(4)).
[4] *Id.* at 175 (PBNDS § 2.12(V)(A)(1)(c)(9)).

18.     Although the people in "administrative segregation" were ostensibly detained separately from the people in "disciplinary segregation," they lived in the same conditions. MTC employees kept Mr. Murillo in uninterrupted solitary confinement for more than ten months until October 2020. During those ten months, Mr. Murillo spent up to twenty-three hours of nearly every day alone in his cell. His cell was so small that when he stretched out his arms, he could almost touch both walls. He spent the majority of his time laying down on the bed. They did not provide Mr. Murillo access to programs, visitation, or any other services. He re-read the same books over and over because he was not allowed access to the library. He developed back pain from lying down all day, every day. For a few of the months that Mr. Murillo spent in solitary confinement, he was the only person in administrative segregation, which meant that even during the single hour that he was allowed out of his cell, he was still deprived of any human interaction. None of this was necessary for his protection or anyone else's; nor did it serve any legitimate custodial goal.

19.     In October 2020, Mr. Murillo and the rest of his protective custody unit were moved to an empty dormitory while maintenance was performed in their unit. For almost two weeks, Mr. Murillo enjoyed the "privileges" of life in the type of protective custody that the PBNDS envisions—he was able to go outside for fresh air, socialize with other detainees, call his family, and go to the library. The men in Mr. Murillo's administrative segregation unit were all there under the guise of being "protected." They did not pose a danger to each other or anyone else and lived peacefully in the dormitory for the entire two-week period.

20.     Even though the dormitory was open and had room to house detainees,[5] MTC and its employees refused to let Mr. Murillo and the other men in his

---

[5] In fact, MTC's Imperial Facility, which is capable of housing at least 500 people, had a population of less than 300 detained people during the time Mr. Murillo was incarcerated there. *See* TRAC Reports, Inc., *Detention Facilities Average Daily*

administrative segregation unit stay there, despite multiple requests from Mr. Murillo and others. Two weeks after they arrived at the dormitory, MTC staff transferred everyone in Mr. Murillo's dorm back to solitary confinement.

21. Back in solitary, Mr. Murillo's mental health sharply deteriorated. He was returned to the same horrific conditions that he had left, and suffered from all the same ill-effects, now exacerbated by the knowledge that there was a viable, more humane alternative. He could not sleep for weeks. He paced back and forth in his cell every day, almost all day, causing him intense back pain. He became paranoid that the staff was playing mind games with him.

22. Mr. Murillo repeatedly asked Imperial staff to move him to a general population dormitory. He filed grievances explaining the toll that months of solitary confinement had taken on him. But Imperial staff denied all of his requests, citing Mr. Murillo's initial "choice" to be placed in protective custody as the sole justification for not releasing him from administrative segregation.

23. MTC employees kept Mr. Murillo in solitary confinement until he was released from detention in February 2021—nearly fourteen months after he arrived. Except for a brief two-week respite in a dormitory, Mr. Murillo's entire detention at Imperial was spent in solitary confinement.

24. MTC acted with a conscious disregard of Mr. Murillo's rights and safety, and with oppression and malice.

**B. MTC's Mistreatment of Mr. Murillo Violated Multiple Terms of its Contract with ICE**

25. MTC's fourteen-month-long confinement of Mr. Murillo in solitary confinement violated at least three of the applicable Performance-Based National Detention Standards with which it is contractually required to comply.

---

*Population*, Syracuse University (Oct. 1, 2021), https://trac.syr.edu/immigration/detentionstats/facilities.html.

26.     PBNDS section 2.12(V)(A)(1)(c)(9) requires that "[a]n individualized assessment must be made in each case" for "detainees who request protective custody."[6] When Mr. Murillo was asked whether he wanted to be in protective custody or general population, an MTC employee told him that protective custody was his only safe option. MTC did not make any individualized assessment as to whether Mr. Murillo was psychologically suited for protective custody, or whether he would actually be in danger in general population (and, if so, whether alternative means existed to protect him). MTC never conducted such an assessment during the entirety of Mr. Murillo's confinement. The MTC employees who decided to put Mr. Murillo in solitary confinement without conducting an assessment as required by the PBNDS were operating within the scope of their employment with MTC.

27.     PBNDS section 2.12(V)(A)(1)(c)(9) requires that "[d]etainees who have been placed in administrative segregation for protective custody shall have access to programs, services, visitation, counsel and other services available to the general population to the maximum extent possible."[7] In the fourteen months that Mr. Murillo spent in solitary confinement, he did not have access to the recreational activities, religious programs, library access, or other programs and services afforded to detainees in the general population. The MTC employees who refused to provide Mr. Murillo access to programs and services during his detention were operating within the scope of their employment with MTC.

28.     PBNDS section 2.12(V)(A)(3)(b) requires that "[a] supervisor shall conduct a[] . . . review after the detainee has spent seven days in administrative segregation, and every week thereafter, for the first 30 days and every 10 days thereafter, at a minimum."[8] MTC did not conduct these reviews for Mr. Murillo every seven to ten days throughout his fourteen-month detention in solitary

---

[6] Ex. A at 175 (PBNDS § 2.12(V)(A)(1)(c)(9)).

[7] *Id.* (PBNDS § 2.12(V)(A)(1)(c)(9)).

[8] *Id.* at 176 (PBNDS § 2.12(V)(A)(3)(b)).

confinement. The MTC employees who failed to conduct these reviews were operating within the scope of their employment with MTC.

29.    The MTC employees' actions, and failures to act, all occurred while they were at Imperial and during their working hours; the employees acted in service to MTC, and its operation of Imperial, rather than in their own interests; and these actions were the kind that MTC hired employees to perform on its behalf.

**C.    MTC Continued to Mistreat Mr. Murillo in Violation of its Contract with ICE, Even After the Federal Government and the State of California Each Issued Reports Admonishing the Facility for its Treatment of People in Protective Custody**

30.    In February 2020, the Department of Homeland Security's Office of the Inspector General ("OIG") conducted an inspection of Imperial. In December 2020, after Mr. Murillo had been in solitary confinement for almost a year, OIG issued a report finding the Facility to be in serious violation of the PBNDS, specifically with respect to its administrative segregation practices, which included the Special Management Unit in which Mr. Murillo was housed.

31.    The OIG report identified multiple "serious violations regarding the administrative segregation of detainees at [Imperial]."[9] It specifically faulted Imperial for "using administrative segregation as a long-term solution for detainees in protective custody and overly restrict[ing] detainees by not offering privileges similar to those offered to detainees in general housing units."[10] Moreover, the OIG inspection revealed that "[Imperial] medical staff were conducting inadequate medical checks — conducting visits when administratively segregated detainees were sleeping — and not physically observing and speaking with each detainee."[11]

---

[9] Off. of Insp. Gen., OIG-21-12, *ICE Needs to Address Prolonged Administrative Segregation and Other Violations at the Imperial Regional Detention Facility* (Dec. 18, 2020), https://www.oig.dhs.gov/sites/default/files/assets/2020-12/OIG-21-12-Dec20.pdf, at p. 4.
[10] *Id.*
[11] *Id.*

8
COMPLAINT

32.     In January 2021, the California Department of Justice ("Cal. DOJ") issued its own report regarding conditions at Imperial. The Cal. DOJ report criticized Imperial for imposing "extremely restrictive" conditions on people in administrative segregation and lacking adequate mental health services.[12]

33.     The Cal. DOJ report noted that "Imperial treats detainees in administrative segregation as restrictively as those in disciplinary segregation, submitting detainees in protective custody to harsh and isolating conditions."[13] The report specifically critiqued Imperial for keeping detainees in protective custody in Restrictive Housing Units ("RHU") "indefinitely," including by refusing "to return a detainee who chose protective custody to general population upon the detainee's request."[14] The Cal. DOJ report also noted that detainees in administrative segregation at Imperial were denied access to programming in direct contravention of the applicable PBNDS.[15]

34.     Among the most concerning of Cal. DOJ's findings was that Imperial provided grossly inadequate mental health care to detainees, particularly those in restrictive housing. The Facility's wellness checks were "inadequate" and Imperial staff displayed a callousness to the mental health needs of the detainees, up to and including dismissing risks of suicide.[16]

35.     Neither the OIG report nor the Cal. DOJ report had any effect on Imperial's practices. Imperial continued to keep Mr. Murillo in twenty-three-hour-per-day solitary confinement, without access to programming, recreation, or adequate medical and mental health services until his release in February 2021.

---

[12]  Cal. Dep't of Just., *The California Department of Justice's Review of Immigration Detention in California* (Jan. 2021), https://oag.ca.gov/sites/all/files/agweb/pdfs/publications/immigration-detention-2021.pdf, at p. 64.
[13] *Id.* at 70.
[14] *Id.* at 70.
[15] *Id.* at 71.
[16] *Id.* at 95.

COMPLAINT

## II.   PROLONGED SOLITARY CONFINEMENT IS A FORM OF TORTURE THAT HAS BEEN PROHIBITED BY INTERNATIONAL LAW

### A.   Prolonged Solitary Confinement is a Form of Torture

36.   Solitary confinement is an extraordinary form of detention, characterized by total and complete isolation and behavioral control, which amounts to a form of torture.

37.   Over the past four decades, researchers and experts have extensively and empirically documented the psychological pain and emotional damage caused by solitary confinement, and particularly bouts of prolonged isolation.[17] Nearly every scientific study of solitary confinement over the past 150 years has concluded that subjecting an individual to more than ten days of involuntary solitary confinement results in negative psychological effects.[18]

38.   Common symptoms observed in solitarily confined detainees include appetite and sleep disturbances, anxiety, panic, rage, loss of control, paranoia, hallucinations, and even self-mutilation.[19] Documented harmful psychological reactions to prolonged isolation include negative attitudes and affect, anxiety, withdrawal, hypersensitivity, ruminations, cognitive dysfunction, hallucinations, irritability, rage, loss of control, hopelessness, lethargy, depression, suicidal ideation and behavior, self-mutilation, and a sense of impending emotional breakdown.[20]

### B.   MTC's Treatment of Mr. Murillo Violated International Law

39.   By holding Mr. Murillo Vega in solitary confinement in excess of fifteen days, MTC also violated international standards on solitary confinement that

---

[17] *See, e.g.*, Craig Haney, *The Science of Solitary: Expanding the Harmfulness Narrative*, 115 Nw. U. L. Rev. 211, 220 (2020); Stuart Grassian, *Psychiatric Effects of Solitary Confinement*, 22 Wash. U. J.L. & Pol'y 325, 327 (2006).

[18] David H. Cloud, et al., *Public Health and Solitary Confinement in the United States*, 105 Am. J. Pub. Health 18, 21 (2015), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4265928/.

[19] Craig Haney, *The Psychological Effects of Solitary Confinement: A Systematic Critique*, 47 Crime & Just. 365, 371-72 (2018).

[20] *Id.*

are binding on the United States. In 2011, Juan E. Méndez, the United Nations Special Rapporteur of the Human Rights Council on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, called for the abolition of solitary confinement except in "very exceptional circumstances and for as short a time as possible[.]"[21] Subsequently, in 2015, the General Assembly of the United Nations adopted the United Nations Standard Minimum Rules for the Treatment of Prisoners (the "Mandela Rules"), which prohibit indefinite solitary confinement and "prolonged" solitary confinement (*i.e.*, solitary confinement for a time period in excess of fifteen consecutive days).[22]

40.     In the 2011 Report on solitary confinement, Méndez determined that, because solitary confinement causes "severe adverse health effects," it constitutes torture as defined in article 1 of the Convention against Torture and Other Cruel, Inhuman and Degrading Treatment or Punishment ("CAT"), and "cruel, inhuman, or degrading treatment or punishment" as defined in article 16 of the CAT and article 7 of the International Covenant on Civil and Political Rights ("ICCPR").[23] The United States signed and ratified the ICCPR on June 2, 1992, and the CAT on October 21, 1994. This makes them binding on the United States. The United States thus has an

---

[21] *See Solitary Confinement Should be Banned in Most Cases, UN Expert Says*, U.N. News (Oct. 18, 2011), https://news.un.org/en/story/2011/10/392012-solitary-confinement-should-be-banned-most-cases-un-expert-says.

[22] *See* U.N. Off. on Drugs and Crime, *The United Nations Standard Minimum Rules for the Treatment of Prisoners (the Nelson Mandela Rules)*, https://www.unodc.org/documents/justice-and-prison-reform/Nelson_Mandela_Rules-E-ebook.pdf, at rule 37 and 43-45; *see also* U.N. Human Rights Off. of the High Commissioner, *United States: Prolonged Solitary Confinement Amounts to Psychological Torture, Says UN Expert* (Feb. 28, 2020), https://www.ohchr.org/EN/NewsEvents/Pages/DisplayNews.aspx?NewsID=25633.

[23] *See* Special Rapporteur of the Human Rights Council, *Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, U.N. Human Rights Council* (Aug. 2011), https://ccrjustice.org/files/UN-Special-Rapporteur-Report-on-Solitary.pdf, at pp. 19-20.

obligation to ensure that solitary confinement is used only in extreme circumstances, and only for short periods of time.

41.     Therefore, in addition to being in violation of federal detention standards, MTC's conduct is also in violation of the international standards relating to solitary confinement that the United States has an obligation to uphold.[24]

### C.     Mr. Murillo Suffered and Continues to Suffer from the Predictable, Detrimental Effects of Prolonged Solitary Confinement

42.     Mr. Murillo experienced many of the negative symptoms associated with prolonged solitary confinement during and after the fourteen months he spent in "administrative segregation." He was unable to sleep and spent days pacing around his cell. He frequently felt hopeless, and he contemplated suicide.

43.     Even after his release, Mr. Murillo has not recovered and continues to suffer from the traumatic effects of his prolonged isolation. He is anxious in enclosed spaces, even in his own bedroom. He suffers from nightmares, frequently waking up in a panic in the middle of the night. He finds it difficult to concentrate. He is reticent to be in groups of people, even friends, because he cannot shake the feelings of isolation and hopelessness that defined his life for over a year. His day-to-day life is permeated with fear that he will go back to solitary confinement and be separated from his family, his friends, and the outside world.

## III.     CALIFORNIA ENACTED GOVERNMENT CODE SECTION 7320 TO PROTECT PEOPLE WITHIN ITS BORDERS FROM ABUSE BY PRIVATE PRISONS

### A.     For-Profit Prison Companies Harm People to Maximize Profits

44.     MTC's treatment of Mr. Murillo is consistent with its business model. For-profit prison companies are some of the most harmful, exploitative institutions

---

[24] Other treaties that include provisions prohibiting torture and cruel, inhumane, or degrading treatment that have been signed by the United States are The Convention on the Elimination of All Forms of Discrimination Against Women ("CEDAW") (signed in 1980), the Convention on the Rights of the Child ("CRC") (signed in 1995) and the Convention on the Rights of Persons with Disabilities ("CRPD") (signed in 2009).

in our society. These companies generate billions of dollars in profits by keeping human beings in cages, cutting costs wherever possible, and forcing the people in their care to suffer.

45.     In 2016, the U.S. Department of Justice's Office of the Inspector General published a review of the for-profit prison companies with which the Federal Bureau of Prisons contracted, including MTC, finding that facilities run by for-profit companies had worse safety and security outcomes than government-run facilities in almost every aspect.[25] That year, Deputy Attorney General Sally Q. Yates issued a letter ordering the Bureau of Prisons to begin the process of reducing, and ultimately ending, its use of for-profit private prisons, including facilities run by MTC.[26] She stated that "[for-profit prisons] simply do not provide the same level of correctional services, programs, or resources" as government-run facilities and "do not maintain the same level of safety and security."[27]

**B.     California Enacted Government Code Section 7320 to Protect People in California from Harm While Housed in For-Profit Detention Facilities**

46.     California enacted Government Code section 7320 to protect people in the state from being abused, exploited, and harmed by for-profit prison companies.[28] The legislation is an important exercise of police power to promote the health, safety, and welfare of California residents detained in for-profit facilities.[29]

---

[25] Dep't of Just., Off. of Inspector Gen., *Review of the Federal Bureau of Prisons' Monitoring of Contract Prisons* (Aug. 2016), https://oig.justice.gov/reports/2016/e1606.pdf, at p. i-ii.

[26] Sally Q. Yates, *Reducing our Use of Private Prisons*, Dep't of Just. Off. of the Deputy Att'y Gen. (Aug. 18, 2016), https://www.justice.gov/archives/opa/file/886311/download.

[27] *Id.*, at p. 1.

[28] Staff of Cal. S. Jud. Comm., *AB 3228 (Bonata) Bill Analysis*, 2019-2020 Regular Sess., at pp. 1-2 (Aug. 10, 2020), https://sjud.senate.ca.gov/sites/sjud.senate.ca.gov/files/ab_3228_bonta_senate_judiciary_committee_analysis.pdf.

[29] *Id.*, at pp. 9-10.

47.     Government Code section 7320 requires "[a]ny private detention facility operator [to] comply with, and adhere to, the detention standards of care and confinement agreed upon in the facility's contract for operations."[30]

48.     The statute allows detainees to bring a civil suit for relief if they have been injured by a for-profit facility's action in violation of the detention standards.[31]

49.     The relevant standards of care for Imperial and other for-profit detention facilities that contract with ICE are ICE's PBNDS. The standards were revised substantially in 2011, and again in 2016, to (1) improve medical and mental health services, (2) increase access to recreation, programs, and services, and (3) improve the process for reporting and responding to complaints.[32]

## CAUSES OF ACTION

### First Cause of Action
### Cal. Gov. Code § 7320

50.     Plaintiff incorporates by reference the facts and allegations set forth in each of the preceding paragraphs as though fully set forth herein.

51.     MTC is a private detention facility operator.

52.     MTC is legally required to exercise a duty of ordinary care and skill in its compliance with and adherence to the detention standards of care and confinement agreed upon in the Facility's contract for operations.

53.     ICE's PBNDS are the applicable detention standards for care and confinement that MTC agreed to abide by in its contract to operate Imperial.

54.     MTC violated ICE's PBNDS sections 2.12(V)(A)(1)(c)(9) and 2.12(V)(A)(3)(b) when it failed to: (1) conduct an individualized assessment of whether "protective custody" was suitable for Mr. Murillo or whether potential

---

[30] Cal. Gov. Code § 7320(a).

[31] *Id.* § 7320(c).

[32] U.S. Imm. and Customs Enf't, *Performance-Based National Detention Standards 2011* (Revised Dec. 2016), https://www.ice.gov/doclib/detention-standards/2011/pbnds2011r2016.pdf.

alternative protective arrangements existed, (2) conduct reviews of Mr. Murillo's status, and (3) provide Mr. Murillo access to facility programs and services. As a result of its acts in violation of the PBNDS, MTC detained Mr. Murillo alone in a cell for twenty-three hours a day for fourteen months.

55.     MTC's above-described acts toward Mr. Murillo constituted tortious actions.

56.     MTC's tortious actions in violation of the PBNDS caused Mr. Murillo's injuries, including physical pain, emotional distress, psychological trauma, and mental deterioration.

57.     MTC did not exercise ordinary care, as it failed to substantially comply with the PBNDS.

## Second Cause of Action
### Negligence

58.     Plaintiff incorporates by reference the facts and allegations set forth in each of the preceding paragraphs as though fully set forth herein.

59.     MTC owed a duty of ordinary care and skill to Mr. Murillo while he was a detainee under its control at Imperial.

60.     MTC breached its duty of care to Mr. Murillo by subjecting him to solitary confinement for nearly fourteen months.

61.     Mr. Murillo's injuries, including physical pain, emotional distress, psychological trauma, and mental deterioration, were caused by MTC's breach.

## Third Cause of Action
### Intentional Infliction of Emotional Distress

62.     Plaintiff incorporates by reference the facts and allegations set forth in each of the preceding paragraphs as though fully set forth herein.

63.     MTC's keeping of Mr. Murillo in solitary confinement, despite his repeated requests and cries for help after he had languished in solitary confinement for over a year, was extreme and outrageous conduct, taken with reckless disregard for the probability of causing Mr. Murillo emotional distress.

64.     As the operator of the facility where Mr. Murillo was detained, MTC was in a special relationship with Mr. Murillo, having total control over Mr. Murillo's life and absolute power to damage his health, safety, and wellness.

65.     As the third largest for-profit prison company in the U.S., with operations all over the world, MTC is well aware of the deleterious effects of solitary confinement on mental health, and particularly those of extended confinement. MTC was also aware of the deleterious effects of solitary confinement on Mr. Murillo's mental health in particular, as Mr. Murillo repeatedly expressed his frustration and anguish to MTC employees during his prolonged isolation.

66.     MTC acted unreasonably by keeping Mr. Murillo in solitary confinement for fourteen months despite knowing that doing so would likely cause him to suffer extreme mental distress.

67.     Mr. Murillo suffered severe and extreme emotional distress.

68.     MTC's extreme, outrageous conduct caused Mr. Murillo's emotional distress.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays that the Court issue the following relief:

A.     Compensatory damages;

B.     Punitive damages;

C.     Attorneys' fees and costs; and

D.     All such other and further relief as the Court may deem just, proper, and equitable.

Dated: October 14, 2021                    Respectfully Submitted,

BRAUNHAGEY & BORDEN LLP

By:  _/s/ Ellen Leonida_____
        Ellen Leonida

*Attorneys for Plaintiff*
*Carlos Murillo Vega*

16
COMPLAINT

## **DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38, Carlos Murillo hereby demands a jury trial of all claims and causes of action triable before a jury.

Dated: October 14, 2021

Respectfully Submitted,

BRAUNHAGEY & BORDEN LLP

By: ___/s/ Ellen Leonida_____
      Ellen Leonida

*Attorneys for Plaintiff*
*Carlos Murillo Vega*

COMPLAINT

# EXHIBIT A

# 2.12 Special Management Units

## I. Purpose and Scope

This detention standard protects detainees, staff, contractors, volunteers and the community from harm by segregating certain detainees from the general population in Special Management Units with an Administrative Segregation section for detainees segregated for administrative reasons and a Disciplinary Segregation section for detainees segregated for disciplinary reasons.

This detention standard applies to the following types of facilities housing ICE/ERO detainees:

- Service Processing Centers (SPCs);

- Contract Detention Facilities (CDFs); and

- State or local government facilities used by ERO through Intergovernmental Service Agreements (IGSAs) to hold detainees for more than 72 hours.

*Procedures in italics are specifically required for SPCs, CDFs, and Dedicated IGSA facilities.* Non-dedicated IGSA facilities must conform to these procedures or adopt, adapt or establish alternatives, provided they meet or exceed the intent represented by these procedures.

For all types of facilities, procedures that appear in italics with a marked (**) on the page indicate optimum levels of compliance for this standard.

Various terms used in this standard may be defined in standard "7.5 Definitions."

## II. Expected Outcomes

The expected outcomes of this detention standard are as follows (specific requirements are defined in "V. Expected Practices").

1. The facility shall have a Special Management Unit (SMU) with provisions for separating the administrative segregation section, for detainees segregated from the general population for administrative reasons, from the disciplinary segregation section, for detainees segregated from the general population for disciplinary reasons.

2. Detainees housed in the general population, staff, contractors, volunteers and the local community shall be protected from harm by the segregation of certain detainees in an SMU.

3. Any detainee who represents an immediate, significant threat to safety, security or good order shall be immediately controlled by staff and, if cause exists and supervisory approval granted, placed in administrative segregation. ICE and the detainee shall be immediately provided a copy of the administrative segregation order describing the reasons for the detainee's placement in the SMU.

4. Administrative segregation may also be available to detainees for the purpose of providing "protective custody." A detainee shall be placed in "protective custody" status in administrative segregation only when there is documentation and supervisory approval that it is necessary to protect a detainee from harm and that no reasonable alternatives are available.

5. A detainee shall be placed in disciplinary segregation only after a finding by a disciplinary hearing panel that the detainee is guilty of a prohibited act or rule violation classified at a "greatest," "high" or "high-moderate" level, as defined in "Appendix 3.1.A: Offense Categories," found in "3.1 Disciplinary System."

6. Disciplinary segregation shall only be ordered when alternative dispositions may inadequately regulate the detainee's behavior.

7. Health care personnel shall be immediately informed when a detainee is admitted to an SMU and shall conduct an assessment and review of the detainees medical and mental health status and care needs. Health care personnel shall at a minimum conduct a daily assessment of detainees

in an SMU. Where reason for concern exists, a qualified medical, or mental health professional shall conduct a complete evaluation.

8. Detainees with serious mental illness may not be automatically placed in an SMU on the basis of such mental illness.  Every effort shall be made to place detainees with serious mental illness in a setting in or outside of the facility in which appropriate treatment can be provided, rather than an SMU, if separation from the general population is necessary.

9. The status of detainees in SMUs shall be reviewed by supervisory staff in accordance with required time schedules, and the results of those reviews shall be documented.

10. A detainee shall remain in disciplinary segregation for no more than 30 days per incident, except in extraordinary circumstances, such as incidents involving violations of offenses 100 through 109 listed in the "Greatest" offense category in Appendix 3.1.A, and his/her status shall be reviewed by the facility administrator after the first 30 days and each 30 days thereafter, to determine whether continued detention in disciplinary segregation is warranted.

11. Detainees in SMU shall be afforded basic living conditions that approximate those provided to the general population, consistent with the safety and security considerations that are inherent in more controlled housing, and in consideration of the purpose for which each detainee is segregated.

12. In general, when a detainee in an SMU is deprived of any usually authorized items or activity, a report of the action shall be forwarded to the facility administrator for notice and review.

13. Detainees in SMU shall have regular access to supervisory, management, program and health care staff.

14. Each detainee in an SMU shall be offered individual recreation or appropriate group recreation time, unless documented security, safety, or medical considerations dictate otherwise.

15. Detainees in SMU shall be able to write, send and receive mail and correspondence as they would otherwise be able to do while detained within the general population.

16. Detainees in SMU shall be provided opportunities for general visitation, including legal visitation, unless there are substantial, documented reasons for withholding those privileges.

17. Detainees in SMU shall have access to personal legal materials, law library materials and legal visits, in accordance with provisions in the PBNDS.

18. Detainees in SMU shall have access to telephones, in accordance with provisions in the PBNDS.

19. Detainees in SMU shall have access to programs and services such as commissary, library, religious guidance and recreation, in accordance with provisions in the PBNDS.

20. Detailed records shall be maintained on the circumstances related to a detainee's confinement to the SMU, through required permanent SMU logs and individual detainee records.

21. The facility shall provide communication assistance to detainees with disabilities and detainees who are limited in their English proficiency (LEP). The facility will provide detainees with disabilities with effective communication, which may include the provision of auxiliary aids, such as readers, materials in Braille, audio recordings, telephone handset amplifiers, telephones compatible with hearing aids, telecommunications devices for deaf persons (TTYs), interpreters, and note-takers, as needed. The facility will also provide detainees who are LEP with language assistance,

2.12 | Special Management Units

172

Exhibit A
Page 2

PBNDS 2011
(Revised December 2016)

including bilingual staff or professional interpretation and translation services, to provide them with meaningful access to its programs and activities.

All written materials provided to detainees shall generally be translated into Spanish. Where practicable, provisions for written translation shall be made for other significant segments of the population with limited English proficiency.

Oral interpretation or assistance shall be provided to any detainee who speaks another language in which written material has not been translated or who is illiterate.

## III. Standards Affected

This detention standard replaces "Special Management Unit (Administrative Segregation)" and "Special Management Unit (Disciplinary Segregation)," both dated 12/2/2008.

## IV. References

American Correctional Association, *Performance-based Standards for Adult Local Detention Facilities*, 4th Edition: 4-ALDF-2A-44 through 2A-66.

ICE/ERO *Performance-based National Detention Standards 2011:*

- "2.4 Facility Security and Control";
- "2.6 Hold Rooms in Detention Facilities";
- "2.10 Searches of Detainees";
- "2.13 Staff-Detainee Communication";
- "3.1 Disciplinary System";
- "4.5 Personal Hygiene";
- "4.6 Significant Self-harm and Suicide Prevention and Intervention";
- "5.1 Correspondence and Other Mail";
- "5.4 Recreation";

- "5.6 Telephone Access";
- "5.7 Visitation"; and
- "6.3 Law Libraries and Legal Material."

"*Standards to Prevent, Detect, and Respond to Sexual Abuse and Assault in Confinement Facilities,*" 79 Fed. Reg. 13100 (Mar. 7, 2014).

## V. Expected Practices

### A. Placement in Administrative Segregation

Administrative Segregation status is a nonpunitive status in which restricted conditions of confinement are required only to ensure the safety of detainees or others, the protection of property, or the security or good order of the facility. For matters of safety and security, staff may have to take immediate action to control a detainee, including placement in administrative segregation.

Detainees in administrative segregation shall not be commingled with detainees in disciplinary segregation.

Each facility shall develop and follow written procedures, consistent with this standard, governing the management of its administrative segregation unit. These procedures should be developed in consultation with the Field Office Director having jurisdiction for the facility. These procedures must document detailed reasons for placement of an individual in administrative segregation. Detainees and the Field Office Director (or his designee) must be provided a copy of the administrative segregation order.

Prior to the detainee's placement in administrative segregation, the facility administrator or designee shall review the case to determine whether administrative segregation is in fact warranted. The facility administrator may delegate to a supervisor the authority to place a detainee in administrative segregation.

### 1. Reasons for Placement in Administrative Segregation

A detainee may be placed in administrative segregation when the detainee's continued presence in the general population poses a threat to life, property, self, staff, or other detainees; for the secure and orderly operation of the facility; for medical reasons; or under other circumstances as set forth below. Some examples of incidents warranting a detainee's assignment to administrative segregation include, but are not limited to, the following.

a. A detainee is awaiting an investigation or a hearing for a violation of facility rules. Pre-disciplinary hearing detention shall be ordered only as necessary to protect the security and orderly operation of the facility.

    1) Pre-disciplinary hearing detention is not to be used as a punitive measure.

    2) A detainee who demonstrates good behavior during pre-disciplinary hearing detention should be considered for release to the general population while awaiting his or her disciplinary hearing.

    3) Time served in pre-disciplinary hearing detention shall  be deducted from any time ordered by the Institution Disciplinary Panel (IDP).

    4) Absent compelling circumstances, such as a pending criminal investigation, a detainee should not remain in pre-disciplinary hearing detention for a longer period of time than the maximum term of disciplinary segregation permitted for the most serious offense charged.

b. A detainee is a threat to the security of the facility. The facility administrator may determine that a detainee's criminal record, past behavior at other institutions, behavior while in ICE/ERO detention, or other evidence is sufficient to warrant placement of the detainee in administrative segregation.

    1) As a general matter, a detainee should not be placed directly in administrative segregation as a security threat on the basis of the detainee's misconduct at that detention facility, in the absence of any disciplinary proceedings. Instead, the facility should address the misconduct through the facility's disciplinary processes, and may place the detainee in pre-disciplinary hearing detention pending the outcome of the disciplinary proceedings.

    2) Continued placement in segregation based on prior behavior should be reviewed at the required intervals, taking into account the detainee's behavior while in segregation.  The facility shall continue to consider, in coordination with the Field Office Director where necessary, whether there are more appropriate alternatives to segregation, such as medium- to maximum-security general population housing units either within the facility or elsewhere.

    3) Copies of records supporting this action shall be attached to the administrative segregation order.

c. A detainee requires protection. Protective custody may be initiated at the detainee's request or by staff as needed to protect the detainee from harm. Each facility shall develop procedures to consider continued placement in protective custody as well as provisions for release from protective custody when appropriate. Frequently, the types of detainees who require this type of treatment include, but are not limited to:

    1) victims of detainee assaults;

    2) detainee informants or witnesses (e.g., detainees who provide information to institutional staff or any law enforcement agency concerning improper or criminal activities by others);

3) sexual predators or other detainees charged with a heinous or notorious crime;

4) detainees who have been pressured by other detainees to participate in sexual activity;

5) detainees who refuse to enter the general population because of alleged intimidation from other detainees;

6) detainees who refuse to return to the general population, but who do not provide the reason for refusal;

7) detainees who appear to be in danger of bodily harm;

8) detainees who seek protection, claiming to be former law enforcement officers or to have held sensitive law enforcement positions, whether or not there is official information to verify the claim; or

9) detainees who request protective custody.

A detainee's age, disability, sex, sexual orientation, gender identity, race, color, national origin, or religion may not provide the sole basis for a decision to place the detainee in involuntary segregation. An individualized assessment must be made in each case.

Use of administrative segregation to protect detainees with special vulnerabilities , including detainees vulnerable to sexual abuse or assault, shall be restricted to those instances where reasonable efforts have been made to provide appropriate housing and shall be made for the least amount of time practicable, and when no other viable housing options exist, and as a last resort.

Detainees who have been placed in administrative segregation for protective custody shall have access to programs, services, visitation, counsel and other services available to the general population to the maximum extent possible.

d. A detainee is scheduled for release, removal, or transfer within 24 hours. Such segregation may be ordered for security reasons or for the orderly operation of the facility.

e. The IDP may recommend a detainee be placed in administrative segregation following disciplinary segregation if it determines that releasing the detainee into the general population would pose a threat to the detainee or security and orderly operation of the facility. However, a subsequent placement in administrative segregation requires an administrative segregation order justifying the placement after the completion of the term served in disciplinary segregation, with the detainee's behavior while in disciplinary segregation being taken into account.

f. A detainee transferred from disciplinary segregation to administrative segregation shall enjoy the same privileges as all other detainees in administrative segregation, provided receipt of such privileges poses no threat to the safety, security, or orderly operation of the facility.

g. A medical professional who ordered a detainee removed from the general population shall complete and sign an administrative segregation order (see below), unless the detainee is to stay in the medical department's isolation ward.

## 2. Administrative Segregation Order

A written order shall be completed and approved by the facility administrator or designee before a detainee is placed in administrative segregation, except when exigent circumstances make such documentation impracticable. In such cases, an order shall be prepared as soon as possible.

a. Prior to a detainee's actual placement in administrative segregation, the facility administrator or designee shall complete the administrative segregation order (Form I-885 or equivalent), detailing the reasons for placing a

2.12 | Special Management Units

175

PBNDS 2011
*(Revised December 2016)*

Exhibit A
Page 5

detainee in administrative segregation.

b. In an emergency, the detainee's placement in administrative segregation may precede the paperwork, which the facility administrator or designee shall prepare as soon as possible after the detainee's placement.

c. All memoranda, medical reports and other relevant documents shall be attached to the administrative segregation order.

d. If the segregation is ordered for protective custody purposes, the order shall state whether the detainee requested the segregation, and whether the detainee requests a hearing concerning the segregation.

e. The administrative segregation order shall be immediately provided to the detainee in a language or manner the detainee can understand, unless delivery would jeopardize the safe, secure, or orderly operation of the facility.

All written materials provided to detainees shall generally be translated into Spanish. Where practicable, provisions for written translation shall be made for other significant segments of the population with limited English proficiency.

Oral interpretation or assistance shall be provided to any detainee who speaks another language in which written material has not been translated or who is illiterate.

f. A copy of the administrative segregation order shall also be immediately provided to the Field Office Director or his designee.

g. The order shall remain on file with the SMU until the detainee is returned to the general population.

h. When the detainee is released from the SMU, the releasing officer shall indicate the date and time of release on the administrative segregation order. The completed order shall then be forwarded to the Chief of Security for inclusion in the detainee's detention file.

### 3. Review of Detainee Status in Administrative Segregation

All facilities shall implement written procedures for the regular review of all detainees held in administrative segregation, consistent with the procedures specified below.

a. A supervisor shall conduct a review within 72 hours of the detainee's placement in administrative segregation to determine whether segregation is still warranted.

   1) The review shall include an interview with the detainee.

   2) A written record shall be made of the decision and the justification. The administrative segregation review (Form I-885) shall be used for the review.

   3) If the detainee has been segregated for his/her own protection, but not at the detainee's request, the signature of the facility administrator or assistant facility administrator is required on the Form I-885 to authorize the alien's continued detention.

b. A supervisor shall conduct an identical review after the detainee has spent seven days in administrative segregation, and every week thereafter, for the first 30 days and every 10 days thereafter, at a minimum.

c. The review shall include an interview with the detainee, and a written record shall be made of the decision and its justification.

d. When the reviewing authority concludes that the detainee should be removed from administrative segregation, he/she shall submit that recommendation to the facility administrator (or designee) for approval.

e. A copy of the decision and justification for each review shall be given to the detainee unless, in exceptional circumstances, this provision would jeopardize the facility's safety, security, or orderly

operations. The detainee shall also be given an opportunity to appeal a review decision to the facility administrator.

f. After seven consecutive days in administrative segregation, the detainee may exercise the right to appeal the conclusions and recommendations of any review conducted to the facility administrator. The detainee may use any standard form of written communication, for example, a detainee request, to file the appeal.

g. If a detainee has been in administrative segregation for more than 30 days and objects to that status, the facility administrator shall review the case to determine whether that status should continue. This review shall take into account the detainee's views and shall result in a written record of the decision and its justification. A similar review shall take place each 30 days thereafter.

A multi-disciplinary committee of facility staff, including facility leadership, medical and mental health professionals, and security staff, shall meet weekly to review all detainees currently housed in the facility's SMU.  During the meeting, the committee shall review each detainee individually to ensure all staff are aware of the detainee's status, current behavior, and physical and mental health, and to consider whether any change in status is appropriate.  Upon the request of the Field Office Director, the facility administrator shall permit ICE/ERO personnel to participate in the weekly meetings, either in person or by teleconference.

## B. Placement in Disciplinary Segregation

To provide detainees in the general population a safe and orderly living environment, facility authorities may discipline anyone whose behavior does not comply with facility rules and regulations. Such discipline may involve temporary confinement in the SMU, apart from the general population. A detainee may be placed in disciplinary segregation only by order of the IDP, or its equivalent, after a hearing in which the detainee has been found to have committed a prohibited act and only when alternative dispositions may inadequately regulate the detainee's behavior.

### 1. Duration

The maximum sanction is 30 days in disciplinary segregation per incident, except in extraordinary circumstances, such as incidents involving violations of offense 100 through 109 listed in the "Greatest" offense category in Appendix 3.1.A. After the first 30 days, and each 30 days thereafter, the facility administrator shall send a written justification for the continued segregation to the Field Office Director.

### 2. Disciplinary Segregation Order

A written order shall be completed and signed by the chair of the IDP (or disciplinary hearing officer) before a detainee is placed into disciplinary segregation.

a. Prior to a detainee's actual placement in disciplinary segregation, the IDP chairman shall complete the disciplinary segregation order (Form I-883 or equivalent), detailing the reasons for placing a detainee in disciplinary segregation. All relevant documentation must be attached to the order.

b. The completed disciplinary segregation order shall be immediately provided to the detainee in a language or manner the detainee can understand, unless delivery would jeopardize the safe, secure, or orderly operation of the facility.

All written materials provided to detainees shall generally be translated into Spanish. Where practicable, provisions for written translation shall be made for other significant segments of the population with limited English proficiency.

Oral interpretation or assistance shall be provided to any detainee who speaks another language in which written material has not been translated or who is illiterate.

The order shall remain on file with the SMU until the detainee is returned to the general population.

c.  When the detainee is released from the SMU, the releasing officer shall indicate the date and time of release on the disciplinary segregation order. The completed order shall then be forwarded to the Chief of Security for inclusion in the detainee's detention file.

### 3. Review of Detainee Status in Disciplinary Segregation

All facilities shall implement written procedures for the regular review of all disciplinary segregation cases, consistent with the following procedures:

a.  A security supervisor, or the equivalent, shall interview the detainee and review his/her status in disciplinary segregation every seven days to determine whether the detainee:

   1) Abides by all rules and regulations; and,

   2) Is provided showers, meals, recreation and other basic living standards, as required by this detention standard.

b.  The supervisor shall document his/her findings after every review, by completing a disciplinary segregation review (Form I-887).

   1) The supervisor may recommend the detainee's early release from the SMU upon finding that time in disciplinary segregation is no longer necessary to regulate the detainee's behavior.

   2) An early-release recommendation must have the facility administrator's approval before the detainee may be returned to the general population.  In conducting this review, the facility administrator will consider any request by the detainee to present written evidence or available witnesses. The review shall take into account the detainee's views.

   3) The supervisor may shorten, but not extend, the original sanction.

   4) All review documents shall be placed in the detainee's detention file.

   5) After each formal review, the detainee shall be given a written copy of the reviewing officer's decision and the basis for his/her finding, unless such a copy may result in a compromise of institutional security. If a written copy cannot be delivered, the detainee shall be advised of the decision orally, and the detention file shall so note, identifying the reasons why the notice was not provided in writing.

c.  The facility administrator  shall review the status of a detainee in disciplinary segregation after the first 30 days of segregation, and each 30 days thereafter, to determine whether continued detention in disciplinary segregation is warranted.

A multi-disciplinary committee of facility staff, including facility leadership, medical and mental health professionals, and security staff, shall meet weekly to review all detainees currently housed in the facility's SMU.  During the meeting, the committee shall review each detainee individually to ensure all staff are aware of the detainee's status, current behavior, and physical and mental health, and to consider whether any change in status is appropriate.  Upon the request of the Field Office Director, the facility administrator shall permit ICE/ERO personnel to participate in the weekly meetings, either in person or by teleconference.

## C. Notifying ICE of Segregation Placements and Facilitating ICE Review

### 1. Extended Segregation Placements

The facility administrator must notify the appropriate Field Office Director in writing whenever an ICE detainee has been held continuously in segregation for:

   a.  14 days, or 14 days out of any 21 day period;

   b.  30 days; and

c.  At every 30-day interval thereafter.

## 2. Immediate Notifications

The facility administrator must notify the appropriate Field Office Director in writing as soon as possible, but no later than 72 hours after the initial placement of an ICE detainee in segregation if:

a.  The detainee has been placed in administrative segregation on the basis of a disability, medical or mental illness, or other special vulnerability, or because the detainee is an alleged victim of a sexual assault, is an identified suicide risk, or is on a hunger strike; or

b.  A detainee placed in segregation for any reason has a mental illness, a serious medical illness, a serious physical disability, or is pregnant or recently had a miscarriage.

For the purposes of this standard, detainees with special vulnerabilities include those:

a.  Who are known to be suffering from mental illness or serious medical illness;

b.  Who have a disability or are elderly, pregnant, or nursing;

c.  Who would be susceptible to sexual abuse or assault in the general population;

d.  Who would be susceptible to harm in the general population due in part to their sexual orientation or gender identity; or

e.  Who have been victims – in or out of ICE custody – of sexual assault, torture, trafficking, or abuse.

## 3. Updates to Segregation Status

The facility administrator must also notify the appropriate Field Office Director in writing whenever a detainee who has been the subject of a prior notification pursuant to this section is subsequently released from segregation.

## 4. Coordination with Field Offices in Reviewing Segregation Placements

The facility administrator shall provide all information and supporting documentation regarding segregation placements as requested by the Field Office Director. The facility administrator shall also coordinate with the Field Office Director in:

a.  considering whether a less restrictive housing or custodial option is appropriate and available, including return to the general population or options to limit isolation while housed in the SMU, such as additional out of cell time and the ability to participate in group activities; and

b.  recommending whether transfer may be appropriate to a hospital or to another facility where the detainee can be housed in the general population or in an environment better suited to the needs of the detainee, such as a facility that has dedicated medical beds in its clinic, a medical observation unit, a facility that has a dedicated protective custody unit, or a facility that has a Special Management Unit with enhanced privileges.

## D. Logs and Records

### 1. Permanent SMU Log

A permanent log shall be maintained in the SMU to record all activities concerning SMU detainees (e.g., meals served, recreational time, visitors, etc.).

The SMU log shall record the detainee's name, A-number, housing location, date admitted, reasons for admission, status review dates, tentative release date (for detainees in disciplinary segregation), the authorizing official, and date released. These logs shall also be used by supervisory staff and other officials to record their visits to the unit.

### 2. Visitors' Log

A separate log shall be maintained in the SMU of all

persons visiting the unit. This separate record shall include notation of:

a. the time and date of the visit, and

b. any unusual activity or behavior of an individual detainee, with a follow-up memorandum sent through the facility administrator to the detainee's file.

### 3. Special Management Housing Unit Record

The Special Management Housing Unit Record or comparable form shall be prepared immediately upon the detainee's placement in the SMU.

a. The special housing unit officer shall immediately record:

   1) whether the detainee ate, showered, recreated and took any medication; and

   2) any additional information, such as whether the detainee has a medical condition, or has exhibited suicidal/assaultive behavior.

   3) the officer that conducts the activity shall print his/her name and sign the record.

b. The facility medical officer shall sign each individual's record when he/she visits a detainee in the SMU. The housing officer shall initial the record after the medical visits are completed, but no later than the end of the shift.

c. A new form must be created for each week the detainee is in the SMU. The completed weekly forms shall be retained at the SMU until the detainee is released from the SMU.

d. Upon a detainee's release from the SMU, the releasing officer shall attach that detainee's entire housing unit record to either the administrative segregation order or disciplinary segregation order and forward it to the Chief of Security or equivalent for inclusion into the detainee's detention file.

### E. Basic Requirements for All Special Management Units

Conditions of confinement are based on the amount of supervision required to control a detainee and to safeguard the detainee, other detainees and facility staff.

In every instance, any exceptions to these requirements shall be:

1. made only for the purpose of ensuring detainee and facility staff safety and security (i.e., not for purposes of punishment);

2. approved by a supervisor (or higher official);

3. on a temporary and situational basis, continued only for as long as it is justified by threat to the safety or security of the facility, its staff, or detainee population; and

4. documented in the Permanent SMU Unit log and, under circumstances specified later in this detention standard, documented in a memo which shall be placed in the individual detainee's detention file.

When a detainee in an SMU is deprived of any usual authorized items or activity, a report of the action shall be forwarded to the facility administrator for review. This report shall be made part of the detainee's detention file.

Placement in an SMU does not constitute a valid basis for the use of restraints while in the SMU or during movement around the facility. Consistent with Standard 2.15, restraints should only be used if necessary as a precaution against escape during transfer, for medical reasons (when directed by the medical officer), or to prevent self-injury, injury to others, or serious property damage.

### F. Translation/Interpretation Services

Detainees shall be provided translation or interpretation services while in the SMU, to assist with their understanding of the reason and conditions of confinement as well as their rights and

responsibilities while in confinement.

## G. Special Needs

Detainees in the SMU shall be provided appropriate accommodations and professional assistance for disabilities and/or other special needs (e.g., medical, therapeutic, or mental health treatment), on an equal basis as those in the general population.

## H. Control of Contraband and Tools

In accordance with procedures detailed in standard "2.4 Facility Security and Control," each facility administrator is required to establish written policy and procedures to control and secure SMU entrances, contraband, tools and food carts.

## I. Cell Occupancy

Ordinarily, the number of detainees confined to each cell or room may not exceed the capacity for which it was designed. Under exigent circumstances, before approving any additional cell occupancy on a temporary basis, the facility administrator shall consult with ICE/ERO Detention Management Division, who shall consult with DHS/ICE legal counsel. If a decision is made to approve such additional cell occupancy, a report of the action shall be filed with the facility and with the Field Office Director.

## J. Cell Condition

Cells and rooms used for purposes of segregation must be well ventilated, adequately lit, appropriately heated/cooled and maintained in a sanitary condition at all times in accordance with the standards for general population, consistent with safety and security.

1. All SMU cells must be equipped with beds that are securely fastened to the cell floor or wall. SMU cells must also be conducive to maintaining a safe and secure environment for all detainees, with particular emphasis on allowing for full visibility and appropriate observation by staff and wherever possible on eliminating potential safety hazards such as sharp edges and anchoring devices.

2. Conditions for close observation in a "dry cell" without water are detailed in standard "2.10 Searches of Detainees."

## K. Personal Property

Each facility shall issue guidelines in accordance with this standard concerning the property detainees may retain in each type of segregation. Generally, detainees in disciplinary segregation shall be subject to more stringent personal property restrictions and control than those in administrative segregation, given the non-punitive nature of administrative segregation.

## L. Privileges

Each facility shall issue guidelines in accordance with this standard concerning the privileges detainees may have in each type of segregation.

### 1. Administrative Segregation

Generally, these detainees shall receive the same privileges available to detainees in the general population, consistent with any safety and security considerations for detainees, facility staff and security.

When space and resources are available, detainees in administrative segregation may be provided opportunities to spend time outside their cells (in addition to the required recreation periods), for such activities as socializing, watching TV and playing board games, and may be assigned to work details (e.g., as orderlies in the SMU).

### 2. Disciplinary Segregation

Generally, these detainees shall have fewer privileges than other detainees in either the general population or in administrative segregation. More specifically, they are subject to more stringent personal property control including, but not limited to, limitations on

their reading material and television viewing (which may be completely terminated), and restricted commissary or vending machine purchases.

## M. Close Supervision

Detainees in SMU shall be personally observed and logged at least every 30 minutes on an irregular schedule. For cases that warrant increased observation, the SMU personnel shall personally observe detainees accordingly. (See also standard "4.6 Significant Self-harm and Suicide Prevention and Intervention" and the "Dry Cells" section in standard "2.10 Searches of Detainees.")

## N. Supervisory and Staff Visits

In addition to the direct supervision performed by unit staff:

1. The shift supervisor shall see each segregated detainee daily, including on weekends and holidays.

2. The facility administrator (or designee) shall visit each SMU daily.

3. Program staff may visit a detainee upon his/her request.

The facility administrator may require other staff to visit each detainee daily.

## O. Specialized Training

Assignments of dedicated and specially trained security staff to SMUs permit staff to have both an improved understanding of the nature of the population and a greater familiarity with particular detainees. Interactions with security staff may be the primary human contact regularly afforded to detainees, and positive communications with security staff can reduce violence and are also important to the well-being of segregated detainees. Adequate training and supervision can ensure that all staff assigned to SMUs live up to this principle.

Security staff assigned to SMU shall receive specialized training in relevant topics, such as:

1. Identifying signs of mental health decompensation;

2. Techniques for more appropriate interactions with mentally ill detainees;

3. The impact of isolation; and

4. De-escalation techniques.

## P. Health Care

Detainees must be evaluated by a medical professional prior to placement in an SMU (or when that is infeasible, as soon as possible and no later than within 24 hours of placement). The assessment should include a review of whether the detainee has been previously diagnosed as having a mental illness.

Health care personnel shall conduct face-to-face medical assessments at least once daily for detainees in an SMU. Where reason for concern exists, assessments shall be followed up with a complete evaluation by a qualified medical or mental health professional, and indicated treatment.

Medical visits shall be recorded on the SMU housing record or comparable form, and any action taken shall be documented in a separate logbook. The facility shall provide out-of-cell, confidential psychological assessments and visits for detainees whenever possible, to ensure patient privacy and to eliminate barriers to treatment.

Mental health staff shall conduct a face-to-face psychological review of all detainees in an SMU at least once every 30 days.

Detainees with a medical or mental illness, or identified as being a suicide risk or on a hunger strike shall be removed from segregation if IHSC or facility medical staff determine that the segregation placement has resulted in deterioration of the detainee's medical or mental health, and an appropriate alternative is available.

### 1. Detainees with Serious Mental Illnesses

Detainees with a serious mental illness, disorder or

condition (SMI), as defined in Standard 4.3 "Medical Care", may not be automatically placed in an SMU on the basis of such mental illness.  Every effort shall be made to place detainees with an SMI in a setting in or outside of the facility in which appropriate treatment can be provided, rather than an SMU, if separation from the general population is necessary.

The facility shall coordinate with the Field Office Director in seeking alternatives to SMU housing for detainees with an SMI, potentially including transfer to a hospital or to another facility.

For any detainee with an SMI placed in restrictive housing:

1. Mental health staff shall conduct a mental health consultation within 72 hours of the detainee's placement in restrictive housing;

2. A multi-disciplinary committee of facility staff, including facility leadership, medical and mental health professionals, and security staff, shall meet weekly to review the detainee's placement in restrictive housing;

3. At least weekly, a mental health provider shall conduct face-to-face clinical contact with the detainee, to monitor the detainee's mental health status, identify signs of deterioration, and recommend additional treatment as appropriate.

The facility shall seek to develop enhanced opportunities for in-cell and out-of-cell therapeutic activities and additional unstructured out-of-cell time for detainees with an SMI, to the extent such activities can be conducted while ensuring the safety of the detainee, staff, and other detainees.

### 2. Pregnant Detainees

Women who are pregnant, who are post-partum, who recently had a miscarriage, or who recently had a terminated pregnancy should as a general matter not be placed in an SMU.   In very rare situations, a woman who is pregnant, is postpartum, recently had a miscarriage, or who recently had a terminated

pregnancy may be placed in an SMU as a response to behavior that poses a serious and immediate risk of physical harm, or if the detainee has requested to be placed in protective custody administrative segregation and there are no more appropriate alternatives available.  Even in such cases, this decision must be approved by a representative of the detention facility administration, in consultation with a medical professional, and must be reviewed every 48 hours.

## Q. Meals

Detainees in SMU shall be provided three nutritionally adequate meals per day, according to the general population meal schedule and ordinarily from the same menu.  Deviation from meals served to the general population must be documented, including an explanation as to why SMU did not receive the same meal.

## R. Clothing and Personal Hygiene

In accordance with standard "4.5 Personal Hygiene," detainees in SMU may shave and shower at least three times weekly and receive other basic services such as laundry, hair care, barbering, clothing, bedding and linen equivalent to general population detainees and consistent with safety and security of the facility.

1. As needed, staff shall provide toilet tissue, a wash basin, tooth brush and shaving utensils, and may issue retrievable kits of toilet articles.

2. A detainee may be denied such items as clothing, mattress, bedding, linens, or pillow for medical or mental health reasons if his/her possession of such items raises concerns for detainee safety and/or facility security.

   a. All denials of such items shall be documented.

   b. If a detainee is so disturbed that he/ she is likely to destroy clothing or bedding, or create a disturbance by risking harm to self or others, the medical department shall be notified

immediately and a regimen of treatment and control shall be instituted by the medical staff, as necessary.

c. Extreme detainee behavior, such as destroying clothing or bedding or harmful behavior to self or others, must be documented, made part of the detainee's file with the facility, and reported to the Field Office Director to implement necessary efforts to protect and care for the detainee.

## S. Correspondence

In accordance with standard "5.1 Correspondence and Other Mail," detainees in an SMU may write, send and receive letters and other correspondence, in a manner similar to those housed in the facility's general population.

## T. Visitation

In accordance with standard "5.7 Visitation," while in an SMU, a detainee ordinarily retains visiting privileges.

Segregated detainees may ordinarily use the visiting room during normal visiting hours. However, the facility may restrict or disallow visits for a detainee who violates visitation rules or whose behavior otherwise indicates the detainee would be a threat to the security or the good order of the visiting room.

1. Visitation may be restricted or disallowed when a detainee in administrative segregation is charged with, or has been found to have committed a prohibited act related to visiting privileges, or has otherwise acted in a way that would reasonably indicate that he/she would be a threat to the orderliness or security of the visiting room.

2. Under no circumstances may detainees participate in visitation while in restraints. If the detainee's behavior warrants restraints, the visit may not be granted under general population visiting conditions.

3. Where visits are restricted or disallowed, a report

shall be filed with the facility administrator and ICE/ERO, and made part of the detainee's file.

4. Detainees in protective custody, and violent and disruptive detainees, shall not use the visitation room during normal visitation hours. In cases in which a visit would present an unreasonable security risk, visits may be disallowed for a particular detainee.

## U. Legal Visits

In accordance with standard "5.7 Visitation," detainees in SMU may not be denied legal visitation. However, the facility administrator or designee may implement whatever security precautions are necessary to protect the detainee and visitors and maintain good order. In such cases, staff shall advise legal service providers and assistants of any security concerns as soon as possible.

## V. Religious Guidance

In accordance with standard "5.5 Religious Practices," detainees in an SMU shall be permitted to participate in religious practices, consistent with the safety, security, and orderly operation of the facility.

Detainees in an SMU shall be allowed visits by members of the clergy or other religious service providers, upon request, unless the supervisor determines that such a visit presents a safety or security risk or would interfere with the orderly operation of the facility. Violent or uncooperative detainees may be temporarily denied access to religious guidance. Staff shall advise the religious service provider of the detainee's present state of behavior before he/she agrees to visit the detainee.

Each facility shall develop procedures to allow detainees to retain religious items within their possession (e.g., religious wearing apparel, religious headwear, prayer rugs, beads, prayer rocks, medallions) consistent with good security practices. (See also standard "5.5 Religious Practices").

## W. Reading Materials (Non-Legal)

Exhibit A
Page 14

Detainees in SMU shall have access to reading materials, including religious materials, in English, Spanish, and other languages frequently encountered in the facility population. The Recreation Specialist shall offer each detainee soft-bound, reading materials of this type on a rotating basis.

## X. Legal Materials

Detainees in SMU shall have access to legal materials in accordance with standard "6.3 Law Libraries and Legal Material."

Detainees may retain all personal legal material upon admittance to an SMU, provided such material does not create a safety, security, or sanitation hazard.

Detainees with a large amount of personal legal material may be required to place a portion with their stored personal property, with access permitted during scheduled hours. Requests for access to such legal material shall be accommodated as soon as possible, but in no case more than 24 hours after receipt of the initial detainee request to retrieve documents, except in the event of documented security reasons.

## Y. Law Library and Legal Rights Group Presentations Access

In accordance with standard "6.3 Law Libraries and Legal Material," detainees housed in administrative segregation or disciplinary segregation units shall have the same law library access as the general population, unless compelling security concerns require limitations.

1. Facilities may supervise the library use of a detainee housed in an SMU as warranted by the individual's behavior.  Violent or uncooperative detainees may be temporarily denied access to the law library if necessary to maintain security, until such time as their behavior warrants resumed access. In some circumstances, legal material may be brought to individuals in disciplinary segregation.

2. Detainees segregated for protection must be provided access to legal materials. Such detainees may be required to use the law library separately or, if that is not feasible, legal materials must be brought to them, upon request.

3. Denial of access to the law library must be:

   a. supported by compelling security concerns;

   b. for the shortest period required for security; and

   c. fully documented in the SMU housing logbook.

The facility administrator shall notify ICE/ERO every time access is denied, with documentation placed in the detention file.

In accordance with standard "6.4 Legal Rights Group Presentations," facility staff and/or ICE/ERO shall notify detainees in segregation in advance of legal rights group presentations and provide these detainees an opportunity to attend.  Group legal rights presentations shall be open to all detainees, including detainees in SMUs, except when a particular detainee's attendance may pose a security risk.  If a detainee in segregation cannot attend for this reason, designated facility staff shall make alternative arrangements to offer a separate presentation and individual consultation to the detainee, if the detainee or the presenter so requests.

## Z. Recreation

Recreation for detainees housed in the SMU shall be separate from the general population.

Facilities are encouraged to maximize opportunities for group participation during recreation and other activities, consistent with safety and security considerations.  Recreation  for certain individuals shall occur separate from all other detainees when necessary or advisable to prevent assaults and to reduce management problems. In accordance with standard "5.4 Recreation":

1. Each detainee in the SMU shall receive (or be

Exhibit A
Page 15

offered) access to exercise opportunities and equipment outside the living area and outdoors, unless documented security, safety or medical considerations dictate otherwise.

2. Detainees in the SMU for administrative reasons shall be offered at least one hour of recreation per day, outside their cells and scheduled at a reasonable time, at least seven days per week. Detainees in the SMU for disciplinary reasons shall be offered at least one hour of recreation per day, outside their cells and scheduled at a reasonable time, at least five days per week.

   **Detainees in the SMU for administrative reasons shall be offered at least two hours of exercise per day, seven days a week, unless documented security, safety or medical considerations dictate otherwise.*

   **Detainees in the SMU for disciplinary reasons shall be offered at least one hour of exercise per day, seven days a week, unless documented security, safety or medical considerations dictate otherwise.*

3. Where cover is not provided to mitigate inclement weather, detainees shall be provided weather-appropriate equipment and attire

4. The recreation privilege shall be denied or suspended only if the detainee's recreational activity may unreasonably endanger safety or security:

   a. A detainee may be denied recreation privileges only with the facility administrator's written authorization, documenting why the detainee poses an unreasonable risk even when recreating alone. However, when necessary to control an *immediate* situation for reasons of safety and security, SMU staff may deny an instance of recreation, upon verbal approval from the shift supervisor, and shall document the reasons in the unit logbook(s). The supervisor may also require additional written

documentation from the SMU staff for the facility administrator. When a detainee in an SMU is deprived of recreation (or any usual authorized items or activity), a written report of the action shall be forwarded to the facility administrator. Denial of recreation must be evaluated daily by a shift supervisor.

b. A detainee in disciplinary segregation may temporarily lose recreation privileges upon a disciplinary panel's written determination that he/she poses an unreasonable risk to the facility, himself/herself, or others.

c. When recreation privileges are suspended, the disciplinary panel or facility administrator shall provide the detainee written notification, including the reason(s) for the suspension, any conditions that must be met before restoration of privileges, and the duration of the suspension provided the requisite conditions are met for its restoration.

d. The denial of recreation privileges shall be included as part of the regular reviews required for all detainees in SMU status. In accordance with SMU procedures, and using the forms required by this standard, the reviewer(s) shall state, in writing, whether the detainee continues to pose a threat to self, others, or facility security and, if so, why.

e. Denial of recreation privileges for more than seven days requires the concurrence of the facility administrator and a health care professional. It is expected that such denials shall rarely occur, and only in extreme circumstances.

f. The facility shall notify the Field Office Director in writing when a detainee is denied recreation privileges in excess of seven days.

## AA. Other Programs and Activities

The facility should seek ways to increase the minimum amount of time that detainees in the SMU

spend outside their cells, and to offer enhanced in-cell opportunities.  In addition to recreation, out-of-cell time might include opportunities for education, clinically appropriate treatment therapies, skill-building, and social interaction with staff and other detainees.

## BB Telephone Access

As detailed in standard "5.6 Telephone Access," detainees in SMU shall have access to telephones in a manner that is consistent with the special safety and security requirements of such units. Detainees shall be permitted to place calls to attorneys, other legal representatives, courts, government offices (including the DHS Office of the Inspector General, DHS Office for Civil Rights and Civil Liberties, ICE/OPR Joint Intake Center, and embassies or consulates, according to the facility schedule. Any denial of telephone access shall be documented.

In general, any detainee in an SMU may be reasonably restricted from using or having access to a phone if that access is used for criminal purposes or would endanger any person, or if the detainee damages the equipment provided. In such instances, staff must clearly document why such restrictions are necessary to preserve the safety, security and good order of the facility. Detainees in disciplinary segregation may be restricted, as part of the disciplinary process, from using telephones to make general calls. However, even in disciplinary segregation, detainees shall have telephone access for special purposes.

## CC. Review of policies

The facility administrator shall establish a standing committee, consisting of security, medical, and other staff, to regularly evaluate SMU policies and practices, and seek to develop safe and effective alternatives to restrictive housing, as well as enhanced SMU conditions and programs.