1
2
3
4
5
6
7
8                           UNITED STATES DISTRICT COURT
9                         SOUTHERN DISTRICT OF CALIFORNIA
10

11    CARLOS MURILLO VEGA,                    Case No.:  21-CV-1770-GPC-LR
12                               Plaintiff,
                                             **ORDER DENYING MOTION FOR**
13    v.                                     **PARTIAL SUMMARY JUDGMENT**
                                             **[ECF No. 76]**
14    MANAGEMENT & TRAINING
      CORPORATION,
15
16                               Defendant.

17
18          Before the Court is Defendant Management & Training Corporation's ("MTC")
19    Motion for Partial Summary Judgment, ECF No. 76, on Plaintiff Carlos Murillo Vega's
20    Complaint, ECF No. 1.  Murillo filed a response in opposition to MTC's Motion, ECF
21    No. 79, and MTC filed its reply, ECF No. 84.  The Court finds that the matter is appropriate
22    for decision without oral argument and pursuant to Civil Local Rule 7.1(d) hereby
23    VACATES the motion hearing previously scheduled for Friday, April 21, 2023.
24          For the reasons set forth below, the Court DENIES the motion for partial summary
25    judgment.
26
27
28                                            1

## I.   PROCEDURAL BACKGROUND

In October 2021, Carlos Murillo Vega, a United States citizen that was previously incarcerated at MTC's private facility, filed a Complaint against MTC for (1) violating California Government Code § 7320; (2) negligence; and (3) intentional infliction of emotional distress ("IIED").   ECF No. 1 (Compl.).   Murillo asks for compensatory damages, punitive damages, and attorneys' fees and costs. *Id.* at 18.

Murillo alleges that he was not adequately informed of the restrictive conditions in the Special Management Unit ("SMU") before he agreed to reside there in protective custody and that his time in protective custody amounted to solitary confinement.  Compl. ¶ 17.  He describes a period of ten months in which he "spent up to twenty-three hours of nearly every day alone in his cell," Compl. ¶ 18; and a period of "a few . . . months" in which there were no other detainees in protective custody such "that even during the single hour that he was allowed out of his cell, he was still deprived of any human interaction," Compl. ¶ 18.  Murillo alleges that during this ten-month period he did not have "access to programs, visitation, or any other services," including the library.  Compl. ¶ 18.  By contrast, during Murillo's brief stay in an open dormitory in October/November 2020, "he was able to go outside for fresh air, socialize with other detainees, call his family, and go to the library."  Compl. ¶ 19.  Murillo alleges that there was room for him and other detainees in protective custody to stay in an open dormitory, Compl. ¶ 20, and that when he returned to the SMU his "mental health sharply deteriorated," Compl. ¶ 21.  Murillo alleges that he still suffers from the detrimental effects of prolonged solitary confinement, including:  anxiety, nightmares, difficulty concentrating, social anxiety, and fear that he will be sent back to solitary confinement.  Compl. ¶ 43.

Murillo alleges that MTC's treatment of him violated at least the following three United States Immigration & Customs Enforcement ("ICE") Detention Standards:  (1) "that '[a]n individualized assessment must be made in each case' for 'detainees who

request protective custody' "; (2) "that '[d]etainees who have been placed in administrative segregation for protective custody shall have access to programs, services, visitation, counsel and other services available to the general population to the maximum extent possible' "; and (3) "that '[a] supervisor shall conduct a[] . . . review after the detainee has spent seven days in administrative segregation, and every week thereafter, for the first 30 days and every 10 days thereafter, at a minimum.' " Compl. ¶¶ 25–28 (alterations and omissions in original) (first quoting PBNDS § 2.12(V)(A)(1)(c)(9), then PBNDS § 2.12(V)(A)(3)(b)). He alleges that the necessary assessments and reviews were not conducted, nor was he given "access to the recreational activities, religious programs, library access, or other programs and services afforded to detainees in the general population." Compl. ¶¶ 26–28. Murillo alleges that these violations of ICE Detention Standards amounted to tortious conduct in violation of California Government Code § 7320, Compl. ¶¶ 50–57, and common law negligence, Compl. ¶¶ 58–61. Murillo also alleges that "keeping [him] in solitary confinement, despite his repeated requests and cries for help after he had languished in solitary confinement for over a year, was extreme and outrageous conduct, taken with reckless disregard for the probability of causing [him] emotional distress." Compl. ¶ 63; *see also* Compl. ¶ 65. He also alleges that "MTC [was] well aware of the deleterious effects of solitary confinement on mental health, and particularly those of extended confinement," Compl. ¶ 65, and that it was unreasonable to keep "Murillo in solitary confinement for fourteen months despite knowing that doing so would likely cause him to suffer extreme mental distress," Compl. ¶ 66.

Murillo seeks to recover compensatory damages, punitive damages, attorneys' fees and costs, and "[a]ll such other and further relief as the Court may deem just, proper, and equitable." ECF No. 1 at 18.

MTC moves for partial summary judgment on Murillo's IIED claim and request for punitive damages, arguing there is no genuine dispute of material fact as to either the cause

1  of action or request for relief and that MTC is entitled to judgment as a matter of law.  ECF

2  No. 76.  Murillo opposes and argues that there are material facts in dispute.  ECF No. 79.

3  MTC has filed a reply.  ECF No. 84.

4  ## II.   FACTUAL BACKGROUND

5  From December 2019 to February 2021, Murillo was detained at the Imperial

6  Regional Detention Facility ("Facility"), which is owned and operated by MTC pursuant

7  to a contract with ICE.  ECF No. 79-1 at 3[1] (Undisputed Material Fact ("UMF") 1–3).

8  MTC "is required to follow ICE's Performance-Based National Detention Standards"

9  ("ICE Detention Standards" or "PBNDS")[2].  ECF No. 12 at 4, 8 (MTC Ans. ¶¶ 14, 53);

10 Compl. ¶¶ 14, 53.  Murillo was promptly placed in "protective custody"[3] and held in the

11 "Special Management Unit"[4] ("SMU").  *See* ECF No. 79-1 at 3–4, 8 (UMFs 4, 24); Compl.

12 ¶ 16.

13 ### A.   Electing Protective Custody

14 On the same day that Murillo arrived at the Facility he completed a Protective

15 Custody Request Form.  ECF No. 76-6 at 2.  The form contains instructions in both English

16 and Spanish.  *Id.*  On the form there is an "X" next to the phrase "I am voluntarily requesting

17 to be . . . placed in protective custody."  *Id.*  Murillo also appears to have written "I was

18 placed in [Special Needs Yard ("SNY")], I'm requesting [Protective Custody]" in the space

19

20

21 [1] Page numbers are based on CM/ECF pagination.

22 [2] *See* U.S. IMMIGR. & CUSTOMS ENF'T, PERFORMANCE-BASED NATIONAL DETENTION STANDARDS (2011), https://www.ice.gov/doclib/detention-standards/2011/pbnds2011r2016.pdf (last visited April 6, 2023).

23 [3] Protective custody is "[a]dministrative segregation for the detainee's own safety."  PBNDS § 7.5 at 472.

24 Administrative segregation is "[a] non-punitive form of separation from the general population used for administrative reasons.  Administrative segregation is available only to ensure the safety of detainees or

25 others, the protection of property, or the security or good order of the facility, as determined by a facility administrator or supervisor."  PBNDS § 7.5 at 464.

26 [4] The SMU is "[a] housing unit for detainees in administrative or disciplinary segregation."  PBNDS § 7.5

27 at 474.

4

28

provided on the form for "Detainee Statement."[5]  *Id.*  The bottom of the form, above the completed signature lines, contains this statement:  "My signature below certifies that I have voluntarily made this request, and that facility staff have discussed alternative housing with me.  I certify my above statement to be true and correct, and I relinquish the facility and staff of any liabilities that may result from my request."  *Id.*  MTC also completed an ICE Custody Classification Worksheet that day which indicates that Murillo did not have any special vulnerabilities or management concerns at the time he arrived at the Facility. ECF No. 79-1 at 16 (AMF[6] 4); ECF No. 79-31 at 2.  Murillo's deposition testimony states that when he first arrived at the Facility, he was told "that they were having gang problems in the general population" and was advised that protective custody "would be safer."  ECF No. 79-10 at 11 (Murillo Dep. Tr. 199:15–20).  He stated that he relied on this information when deciding to go into protective custody.  *Id.* (Murillo Dep. Tr. 199:20–22).  Nicholas Rodriguez, the former Chief of Security at the Facility, ECF No. 79-3 at 29, indicated that if a new detainee had already been housed in a Special Housing Unit ("SHU") at a State prison system, he did not "describe to them what ad[ministrative] seg[regation] look[ed] like at [the Facility]."  ECF No. 79-9 at 9–10 (Rodriguez Dep. Tr. 76:8–77:7).  Murillo has indicated that he agreed to protective custody at the facility because he thought it was going to be comparable to the SNY from the previous facility.  ECF No. 79-10 at 13 (Murillo Dep. Tr. 207:13–19).

---

[5] It is unclear why Murillo was placed in the SNY at the previous facility.  *See* ECF No. 79-10 at 13 (Murillo Dep. Tr. 206:19–207:12); ECF No. 79-12 at 16–17 (Veloz Dep. Tr. 268:24–270:8) (MTC's Classification Supervisor indicating that Murillo's only clear explanation for why he had been placed in SNY was because "he feared to be placed in general population"); *see also* ECF No. 76-7 at 2 ("Murillo-Vega advised/stated that he would need PC housing due to his previous SNY housing history. . . . For safety and security facility needs and concerns, [Murillo] will be housed in the RHU under PC status pending administrative review.")

[6] "AMF" denotes Additional Material Facts alleged by Murillo.  MTC disputes only some AMFs in its reply.  *See* EF No. 84 (absence).

### B.   Mental Health Sessions

During his time in the SMU, Murillo was permitted to see Licensed Professional Counselor Brenda Casteau, on a monthly basis, subject to whether he "expressly refused treatment." ECF No. 79-1 at 4 (UMF 7). He was first seen several days after entering the SMU, *id.* (UMF 6), and was seen 11 more times before his release from custody in February 2021: ten times in 2020, *id.* at 5–11 (UMFs 9, 12, 14, 15, 17, 19, 21, 23, 29, and 34),[7] and once in January 2021, *see id.* at 11–12 (UMF 35) (Murillo disputes these UMFs, but apparently only to the extent MTC asserts Murillo "made no complaints regarding his protective housing custody status"). In Casteau's notes from these sessions, Murillo did not report experiencing any psychiatric or mental health issues. *See, e.g.*, ECF No. 79-1 at 4 (UMF 6). However, he indicated at some sessions that he was experiencing stress, ECF No. 76-12 at 2, feelings of negativity, ECF No. 76-19 at 2, and frustration, ECF No. 76-26 at 2.

Murillo does not dispute whether he was seen by Casteau on these dates; instead he challenges the relevancy of these facts given evidence suggesting that "Casteau had challenges 'building a trust relationship' with detainees";[8] "did not develop a trust relationship with . . . Murillo"; "lacked the training to 'identify signs that certain detained persons would suffer great harm if they remained in solitary confinement' "; "did not even notice" Murillo's "symptoms and disabilities"; and "had no control over housing placement decision[s]." *See, e.g., id.* at 4, 5 (UMFs 7, 11) (first quoting ECF No. 79-13 at 8 (Casteau Dep. Tr. 36:17–19), second referring to ECF No. 79-10 at 9–10 (Murillo Dep. Tr. 50:18–

---

[7] Murillo refused sessions with Casteau four times in 2020. ECF No. 79-1 at 5–6, 9–10 (UMFs 8, 11, 13, 28).

[8] Casteau had been asked whether she "ever had any *concerns* about building a trust relationship with a detainee." ECF No. 79-13 at 8 (Casteau Dep. Tr. 36:17–18) (emphasis added). She answered: "Working at a detention center, of course." *Id.* (Casteau Dep. Tr. 36:19).

51:13), third quoting ECF No. 79-6 at 17, fourth quoting *id.* at 16, and fifth referring to ECF No. 79-13 at 11–12 (Casteau Dep. Tr. 90:10–91:14)).   Murillo explained in his deposition testimony that he did not share with Casteau every issue that bothered him because he did not "feel comfortable sharing personal information where everybody else was able to hear what [he] was saying." ECF No. 79-10 at 9–10 (Murillo Dep. Tr. 50:21–51:3).

MTC alleges that Casteau alleged that "she and [Murillo] had a quality trust relationship," ECF No. 76-1 at 11, but cites to an irrelevant exhibit that makes no mention of Casteau or her relationship with Murillo, *see* ECF No. 76-32 (absence).

### C.   Conditions Of Confinement

Murillo's exact conditions of confinement while in protective custody are somewhat unclear.   Murillo has alleged that he was kept "in uninterrupted solitary confinement for more than ten months," spending "up to twenty-three hours of nearly every day alone in his [small] cell" and that he had severely limited "access to programs, visitation, or any other services," including library access.[9]   Compl. ¶¶ 17–18.   He further alleges that for a few months of his detainment, "he was the only person in administrative segregation, which meant that even during the single hour that he was allowed out of his cell, he was still deprived of any human interaction."[10]   Compl. ¶ 18.   MTC does not plainly discuss the conditions of Murillo's confinement in its motion, instead pointing to Casteau's Mental Health Progress notes.   *See* ECF No. 76-1 at 4–8.   The sessions were only once per month and the notes are not particularly descriptive.   Starting at the end of June 2020, Casteau's notes indicate that Murillo was able to regularly contact family, watch television, recreate with other detainees, and attend Bible study.   ECF No. 76-15 at 2; *see* ECF No. 76-1 at 5–

---

[9] MTC denies these assertions in its answer.   ECF No. 12 at 4–5 (Ans. ¶¶ 17–18).

[10] MTC denies these assertions in its answer.   *Id.* at 5 (Ans. ¶ 18).

6 (June 2020 session appears to be first one that documents access to services, resources, and socialization).[11]   MTC's *reply* brief denies that the SMU amounted to solitary confinement and alleges that Murillo "received daily checks, monthly private mental health sessions with Ms. Casteau, . . . watched television, went to recreation with other detainees, exercised, worked two jobs, and attended religious services and Bible study," ECF No. 84 at 3.  But in support, MTC only points to Casteau's Mental Health Progress notes, none of which mention these purported "daily checks" or working two jobs, and notes from only five sessions from his roughly 14-month detainment plainly indicate that he had been socializing with other detainees or family, or given access to a television or religious services.  *See* ECF No. 76-15 at 2 (June 26, 2020 notes), 76-16 at 2 (July 24, 2020 notes), 76-17 at 2 (August 21, 2020 notes; Murillo was able to attend services led by Chaplain, but apparently did not have anyone that shared his faith in the dorm), 76-18 at 2 (September 18, 2020 notes), 76-30 (January 14, 2021 notes).[12]

In contrast, Murillo's exhibits strongly suggest that at least significant portions of his period of confinement were as described in the Complaint.  A former MTC employee testified in his deposition that until late 2020, detainees wanting to go out "to the yard" would be placed in a 6 foot by 12 foot "fenced-in yard," or "cage."  ECF No. 79-9 at 11–12 (Rodriguez Dep. Tr. 149:13–15, 149:21–150:7).  Detainees could see other detainees while in the yard, but they would have the individual yard to themselves; they had "no interaction with each other."  *Id.* at 12 (Rodriguez Dep. Tr. 150:2–14); *see also* ECF No. 79-36 at 6–7 (Cortez Dep. Tr. 70:21–71:7).  Modifications were made in late 2020 such

---

[11] Notes from May 2020 state that Murillo had been preaching and that his mother was doing well, but there is no indication as to how often he preached or was in contact with his mother.  *See* ECF No. 76-14 at 2.

[12] Notes from February 2020 could indicate that Murillo had been in contact with his mother, but it is unclear.  ECF No. 76-10 at 2 ("Pt states his mothers [sic] encourages him during these times . . . .").

1   that detainees in the SMU could recreate together.  *Id.* (Rodriguez Dep. Tr. 150:15–18).

2   Murillo filed a grievance in March 2020 indicating he had only been able to access the

3   library once since he arrived at the Facility, had not been able to socialize with anyone, and

4   had different access to programming compared to someone in general population.  ECF

5   No. 79-14 at 2.  MTC responded that it had plans to allow detainees to recreate together in

6   a "big yard" and increase library access.  *Id.*

7          Murillo also provided two reports from government agencies that corroborate his

8   description of administrative segregation.[13]  The first report is from the Department of

9   Homeland Security ("DHS") following an unannounced inspection of the Facility in

10  February 2020.  ECF No. 79-53 at 4.  Among other problems, DHS "determined detainees

11  were held in administrative segregation for prolonged periods of 22 to 23 hours a day,

12  including two detainees who had been held in isolation for more than 300 days."  *Id.*  It

13  found that the Facility "was using administrative segregation as a long-term solution for

14  detainees in protective custody and overly restricted detainees by not offering privileges

15  similar to those offered to detainees in general housing units."  *Id.* at 8.  "According to ICE

16  and facility staff, no alternative, less restrictive housing was sought for detainees in

17

18  _____

19  [13] MTC states that it "maintains and reiterates its objection to the use or reference to the irrelevant and

20  inadmissible reports by the ICE Office of Inspector General and/or the California Department of Justice."
    ECF No. 84 at 10.  However, it provides no citation to where it has previously objected to the use of these

21  reports, and its conclusory statements that the reports are irrelevant and inadmissible are inadequate to
    sustain the objection.  "The court need consider only the cited materials . . . ." Fed. R. Civ. P. 56(c)(3).

22         Furthermore, both reports are relevant because they tend to make more probable that the Facility

23  failed to comply with the PBNDS regarding administrative segregation policies and that it was on notice
    about its PBNDS violations for at least part of the time Murillo was detained at the Facility.  A qualified

24  expert could reasonably provide testimony on the reports; the reports presumptively would not be hearsay
    as a public record under Federal Rule of Evidence 803(8); and at least portions of the report could be

25  judicially noticed.  MTC fails to explain why these reports would be "wholly inadmissible" and its
    objection is denied.  *See Fraser v. Goodale*, 342 F.3d 1032, 1036–37 (9th Cir. 2003) ("At the summary

26  judgment stage, we do not focus on the admissibility of the evidence's form.  We instead focus on the
    admissibility of its contents.").

27                                                      9

28                                                                              21-CV-1770-GPC-LR

administrative segregation, as required by the 2011 PBNDS." *Id.* at 9.  Facility records also "showed the facility inaccurately reported to ICE that detainees were receiving recreation time when, in fact, they were not."  *Id.* DHS documented other inadequate conditions at the Facility which "endangered the health and safety of detainees." *See id.* at 10–15.  The person most knowledgeable of MTC, Edward Ruiz,[14] did not "think" the Facility "made any changes to their policy" after this report was published; asserted that the Facility would have developed a "corrective action" to address any deficiencies highlighted in the report; and did not "notice any changes to the protective custody policies after" the report was published.  ECF No. 79-28 at 18–19 (Ruiz Dep. Tr. 174:9–176:6).

The second report was prepared by the California Department of Justice ("Cal DOJ") after "a multiday comprehensive site visit to [the Facility] from June 3 through June 6, 2019."[15]  ECF No. 79-54 at 77.  Similar to the DHS report, Cal DOJ found that detainees "housed in administrative segregation experience[d] extremely restrictive conditions, nearly identical to those facing disciplinary segregation (isolation) as a punishment for misconduct."  *Id.*; *see also id.* at 82–84 (additional findings).  It also found that the Facility "maintain[ed] poor health care records and lack[ed] adequate mental health services."  *Id.* at 77; *see also id.* at 101–102, 104–109 (additional findings).

MTC asserts that Murillo did not make any "complaints regarding his protective custody housing status" until he returned from a brief stay in an open dormitory in November 2020.  ECF No. 79-1 at 5, 9 (UMFs 10, 26); *see also id.* at 5–9 (UMFs 12, 14, 16, 18, 20, 22, 23).  In support of these assertions, MTC relies entirely on Casteau's Mental

---

[14] At the time of the September 2022 Deposition, Ruiz was the Assistant Facility Administrator at MTC; a position he held since October 2018.  ECF No. 79-28 at 8 (Ruiz Dep. Tr. 11:12–16).  He was deposed as the "person most knowledgeable of [MTC]."  *Id.* at 2 (Ruiz Dep. Tr.).

[15] Although Cal DOJ visited the facility in June 2019, before Murillo was detained there, the report was not published until January 2021.  *See* ECF No. 79-54 at 2.

Health Progress notes, *id.* at 5–9 (UMFs 10, 12, 14, 16, 18, 20, 22, 23), none of which indicate whether he was prompted to provide feedback on his housing status, *e.g.*, ECF No. 76-10 at 2.  It is undisputed that, upon returning from the brief stay in an open dormitory, Murillo "began submitting written requests and grievances to be transferred to a general population unit." ECF No. 79-1 at 9 (UMF 26).  Murillo also points to a grievance from March 8, 2020 in which Murillo complained about the lack of privileges in protective custody housing compared to the SNY yard:  very limited access to the library and an inability to socialize with others.  ECF No. 79-1 at 5 (UMF 10); ECF No. 79-14 at 2.  In the grievance, he requested "the same accommodations as someone who is not on disciplinary action, but yet has been on an SNY yard." ECF No. 79-14 at 2.  A staff member responded a little over one week later to share plans to expand recreation and library hours. *Id.* Another staff member responded the following week, indicating that Murillo and the staff member had "spoken numerous times of this issue relative to [Murillo's] housing" and that they were making changes to accommodate the concerns he raised.  *Id.*  Murillo was appreciative of these changes.  *See id.* ("[T]hank you for the changes that you have made to make our stay here a lot more comfortable very greatly appreciated.").

### D.    Temporary Placement In Open Dormitory

Murillo remained in protective custody from December 2019 until the end of October 2020 when he was temporarily moved to an open dormitory with others in protective custody.  ECF No. 79-1 at 8 (UMF 24).  MTC asserts that Murillo's move was "due to scheduled maintenance of the [SMU]," and it submits a form suggesting that Murillo was informed that this move would be temporary and due to scheduled maintenance.  *Id.* at 8 (UMF 24); ECF No. 76-20 at 2.  Murillo disputes MTC's assertion that the move was supposed to be temporary and that it was due to scheduled maintenance in the SMU.  ECF No. 79-1 at 8 (UMF 24).  He points first to the Special Management Release Form—purportedly completed within 24 hours before Murillo left the SMU—

11

which states that, during a routine SMU detainee evaluation, the SMU Committee discussed whether less restrictive housing would be appropriate and "agreed to release [Murillo] to an open dorm housing mike unit dorm under protective custody status." ECF No. 79-27 at 2. He points second to Edward Ruiz's deposition testimony in which Ruiz recalled the SMU being shut down for "painting, cleaning of the vents, general things like replacement of lights . . . [or] screws." ECF No. 79-28 at 12 (Ruiz Dep. Tr. 102:7–12). However, after affirming that there would be a work order for things like a paint job or replacing lights, Ruiz reviewed the two work orders that were produced in response to Murillo's "request for documents concerning the closure of" the SMU—one of which was made a week after the SMU was closed—and the two work orders were for only a toilet that turned out to be "working normally upon arrival" and to replace a night light. *Id.* at 12–14 (Ruiz Dep. Tr. 102:13–104:24).

### E.    Return To Protective Custody And Filing Requests And Grievances

On November 10, 2020, Murillo was transferred back to the SMU. ECF No. 79-1 at 9 (UMF 25). Thereafter, he regularly filed grievances about the SMU and requests to move back to an open dormitory. *Id.* at 5, 9–11 (UMFs 10, 26, 27, 30, 31). His requests and grievances made clear that he wanted to move out of protective custody and into the general population. *See, e.g.*, ECF No. 79-15 at 2; 79-16 at 2; 79-17 at 2. On November 18, 2020, the SMU Committee "reviewed," "considered,"[16] and denied Murillo's request to be removed from protective custody. ECF No. 79-17 at 2. It referred Murillo's request to ICE "for final disposition, of which was also declined." *Id.* MTC staff

---

[16] Murillo disputes the extent to which the SMU Committee meaningfully considered Murillo's request. ECF No. 79-1 at 10–11 (UMF 32). He asserts that "assessments for each detainee at SMU Committee meetings lasted just over a minute," *id.*, and points to Ruiz's deposition testimony that appears to discuss the December 2019 meeting in which Murillo was first placed into protective custody, ECF No. 79-28 at 11 (Ruiz Tr. 98); *see also* ECF No. 79-3 at 24 (Hansen Report).

cited safety and security as the reason for denying his request: "based on [Murillo's] initial request to be placed on [Protective Custody] status and the length of time [he] spent under this status, [his] placement in the General Population – High Custody [was] not considered to be a safe environment for." *Id.*

Murillo remained in the SMU until his release from the Facility in early February 2021.  ECF No. 79-1 at 12 (UMF 36).

## III.   LEGAL STANDARDS

Federal Rule of Civil Procedure 56 empowers the Court to enter summary judgment on factually unsupported claims or defenses, and thereby "secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 327 (1986) (quoting Fed. R. Civ. P. 1).  Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).   A fact is "material" if it might affect the outcome of the case and a dispute is "genuine" if there is evidence "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict—'whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed.' " *Id.* at 252 (alteration and emphasis in original) (quoting *Improvement Co. v. Munson*, 81 U.S. 442, 448 (1871)).

The moving party bears the initial burden of demonstrating the absence of any genuine issues of material fact.  *Celotex Corp.*, 477 U.S. at 323.  The moving party can satisfy this burden by demonstrating that the nonmoving party failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322.  If the moving party fails

to meet this initial burden, summary judgment must be denied, and the court need not consider the nonmoving party's evidence. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 159-60 (1970). Parties may support their assertion that a fact is or is not disputed by pointing to "depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" in the record. Fed. R. Civ. P. 56(c)(1)(A). Parties "may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2).

Once the moving party has satisfied its initial burden, the nonmoving party cannot rest on the mere allegations or denials of their pleading but must "go beyond the pleadings and by [their] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " *Celotex Corp.,* 477 U.S. at 324. If the nonmoving party fails to make a sufficient showing of an element of its case, the moving party is entitled to judgment as a matter of law. *Id.* at 325. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In making this determination, the court must "view[] the evidence in the light most favorable to the nonmoving party." *Fontana v. Haskin*, 262 F.3d 871, 876 (9th Cir. 2001). The court must not engage in "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts"; these functions are for the trier of fact. *Anderson*, 477 U.S. at 255; *see also Bravo v. City of Santa Maria*, 665 F.3d 1076, 1083 (9th Cir. 2011) (same).

## IV.   DISCUSSION

MTC argues that it is entitled judgment as a matter of law on Murillo's IIED claim and his request for punitive damages. ECF No. 76.

### A.   Intentional Infliction Of Emotional Distress

A cause of action for IIED requires that the plaintiff show: "(1) outrageous conduct by the defendant; (2) the defendant's intention of causing or reckless disregard of the probability of causing emotional distress; (3) the plaintiff's suffering severe or extreme emotional distress; and (4) actual and proximate causation of the emotional distress by the defendant's outrageous conduct." *Huntingdon Life Scis., Inc. v. Stop Huntingdon Animal Cruelty USA, Inc.*, 129 Cal. App. 4th 1228, 1259 (2005) (quoting *Trerice v. Blue Cross of California*, 209 Cal. App. 3d 878, 883 (1989)); *see also Hughes v. Pair*, 46 Cal. 4th 1035, 1050 (2009) (describing same requirements but allocating them into three elements).

MTC argues that the first and second elements cannot be established. ECF No. 76-1 at 9–12.

### 1.   Outrageous Conduct

Conduct is considered "outrageous" when it is "so extreme as to exceed all bounds of that usually tolerated in a civilized society." *Huntingdon*, 129 Cal. App. 4th at 1259. Examples of outrageous conduct include when "a defendant (1) abuses a relation or position which gives him power to damage the plaintiff's interest; (2) knows the plaintiff is susceptible to injuries through mental distress; or (3) acts intentionally or unreasonably with the recognition that the acts are likely to result in illness through mental distress." *Argawal v. Johnson*, 25 Cal. 3d 932, 947 (1979). "Under California law, where reasonable persons may differ as to whether 'the conduct has been sufficiently extreme and outrageous to result in liability,' the issue is a question for the trier of fact." *Michel v. United States*, No. 16cv277-GPC(AGS), 2017 WL 5067608, at *16 (S.D. Cal. Oct. 31, 2017) (quoting *Alcorn v. Anbro Eng'g. Inc.*, 2 Cal.3d 493, 499 (1970)).

MTC's purportedly outrageous "conduct" was keeping "Murillo in solitary confinement, despite his repeated requests and cries for help after he had languished in solitary confinement for over a year." Compl. ¶ 63. MTC argues that Murillo "cannot

1  establish extreme and outrageous conduct by MTC" because (1) Murillo "was housed in
2  the SMU as protective custody status per his written request"; (2) "MTC, at the direction
3  of ICE, denied [his] request to be moved to general population" for reasons of safety and
4  security; and (3) "there is no evidence that the circumstances leading to [Murillo]'s request
5  for protective custody upon his arrival at the [F]acility in December 2019 had changed, or
6  that it was any safer for him to be housed in general population in November 2020 than it
7  was upon his arrival at the facility." ECF No. 76-1 at 9–10.

8         Murillo responds by arguing that MTC "acted outrageously by implementing a
9  defective system of policies and procedures that resulted in Mr. Murillo being improperly
10 isolated in a small cell for 14 months, resulting in severe emotional distress." ECF No. 79
11 at 20. He argues that regardless of his request to be placed in protective custody, MTC
12 was obligated "to make a reasonable, safe housing assignment for" him and acted
13 outrageously by failing to do so both at the outset and after he requested to transfer to
14 general population in November 2020. *Id.* Murillo reasons that the burden was on MTC,
15 not him, "to assess whether it would be safe for him to move to general population and to
16 make efforts to transition [him] towards a more integrated general population rather than
17 isolating him in the SMU." *Id.* Murillo further provides a list of alleged actions by MTC,
18 each of which he argues would suffice for a jury to find MTC engaged in outrageous
19 conduct. *Id.* at 18–19. He points to the duration of Murillo's isolation allegedly without
20 MTC "ever identifying a specific threat to his safety in general population"; MTC's alleged
21 "policy of using administrative segregation unit as a default, long-term solution for
22 protective detainees, even though its written policy only allows it as a last resort";[17] MTC

_____

[17] MTC, to some extent, points out an inaccuracy in this statement. *See* ECF No. 84 at 4 ("[T]he PBNDS
nowhere states that housing protective custody detainees in administrative segregation can only be done
as a 'last resort.' "). The PBNDS instructs that administrative segregation for detainees with special
vulnerabilities "shall be restricted to those instances where reasonable efforts have been made to provide
appropriate housing and shall be made for the least amount of time practicable, and when no other viable

16

allegedly failing to adequately inform Murillo about the conditions of protective custody and failing to offer safe alternatives; MTC allegedly failing "to conduct the required individualized assessment of the need for and validity of Mr. Murillo's continued placement in SMU"; MTC's allegedly improper denials of Murillo's requests to leave the SMU; and MTC's alleged "policy that once a detainee spends time in protective custody, he cannot return to general population." ECF No. 79 at 18–19. He reasons that these actions violated PBNDS and whether it qualifies as outrageous conduct is a question that should be addressed by the jury. *Id.* at 19.

MTC engages with only some of Murillo's arguments and alleged facts in its reply. It asserts that "PBNDS specifically states that protective custody is required when requested by a detainee." ECF No. 84 at 4 (referring to PBNDS § 2.12(V)(A)(1)(c)). However, PBNDS § 2.12(V)(A)(1)(c) is not so clear cut. Rather, it instructs that "[p]rotective custody may be initiated at the detainee's request or by staff as needed to protect the detainee from harm" and that each facility "shall develop procedures to consider continued placement in protective custody as well as provisions for release from protective custody when appropriate." PBNDS § 2.12(V)(A)(1)(c). Although there appears to be a preference for protective custody when a detainee requests as much, there is no indication in the PBNDS that it is required. Furthermore, the PBNDS plainly instructs that a Facility employee was required to provide documentation "detailing the reasons for placing a

---

housing options exist, and *as a last resort*." PBNDS § 2.12(V)(A)(1)(c). The PBNDS specifically defines special vulnerability detainees as "those who are elderly, pregnant, or nursing; those with serious physical or mental illness, or other disability; those who would be susceptible to harm in general population due in part to their sexual orientation or gender identity; and those who have been victims of sexual assault, torture, trafficking, or abuse." PBNDS § 7.5 at 474. Murillo did not have any reported special vulnerabilities. *See* ECF No. 79-31 at 2. Somewhat synonymous to "last resort," however, is the instruction that "[a] detainee shall be placed in 'protective custody' status in administrative segregation *only* when there is documentation and supervisory approval that it is necessary to protect a detainee from harm and that *no reasonable alternatives are available*." PBNDS § 2.12(II)(4).

21-CV-1770-GPC-LR

1    detainee in administrative segregation," PBNDS § 2.12(v)(A)(2)(a), and that at regular

2    intervals supervisors were supposed to review and determine whether a "detainee's

3    placement in administrative segregation . . . is still warranted," PBNDS § 2.12(V)(A)(3).

4    These instructions indicate that administrative segregation is not expected to be the default

5    housing placement absent justification.  Even assuming that Murillo had been adequately

6    informed about what life was like in protective custody,[18] MTC ignores that PBNDS

7    allocates the burden to MTC, not the detainee, to justify housing a detainee in

8    administrative segregation.  *See* PBNDS § 2.12(V)(A); ECF No. 79-3 at 21–26 (expert

9    report); ECF No. 79-54 at 38 (Cal DOJ report).  MTC fails to explain or point to any "safety

10   and security" justification for placing Murillo in protective custody and then keeping him

11   there.[19]  *See, e.g.*, ECF No. 76-7 at 2 (December 2019 report pointing only to Murillo's

12   request and previous stay in SNY); ECF No. 76-27 at 2 (November 2020 response to

13   Murillo's grievance citing only his initial request for protective custody and duration of

14   protective custody); ECF No. 76-1 at 9–10.  MTC's assertion that it satisfied its contractual

---

[18] It is at least disputed that Murillo had not been adequately informed.  MTC's former employee and former Chief of Security appears to have assumed that detainees knew what the SMU would be like when they were contemplating protective custody if they came from SNY at another facility.  *See* ECF No. 79-9 at 7–10 (Rodriguez Dep. Tr. 74:4–77:10).  MTC's classification supervisor did not think anyone at the Facility would have informed Murillo that "being placed in protective custody initially might lead to him being put in protective custody his entire detention."  ECF No. 79-12 at 20 (Vega Dep. Tr. 276:4–10).  Murillo explained during his deposition that he "decided to go into protective custody" because someone at the Facility told him "they were having gang problems in the general population,"  ECF No. 79-10 at 11 (Murillo Dep. Tr. 199:15–22), and because he had been "on a 50-50 yard" at the last facility, *id.* at 12–13 (Murillo Dep. Tr. 206:19–207:12).  MTC does not offer any evidence indicating that Murillo had been adequately informed as to the protective custody conditions at the Facility.  *See* ECF No. 79-1 (UMF 4) (absence); ECF No. 84 at 4 (absence).

[19] MTC suggests that they may have placed Murillo in the SMU to "honor" to his "own articulated fear of the general population."  ECF No. 84 at 4–5.  However, they rely on deposition testimony from their own employee to support this statement, *id.* at 5, and the witness was responding to a question asking why Murillo had been "placed in SNY during his time" in the previous facility, ECF No. 79-12 at 17 (Veloz Dep. Tr. 269:14–23).

obligations under the PBNDS is provided without citation to any evidence and is not persuasive. *See* ECF No. 84 at 5.

Furthermore, MTC fails to adequately engage with Murillo's allegations that the conditions of his detainment were extreme, outrageous, and in violation of PBNDS § 2.12(V)(A)(1)(c)(9). *See* Compl. ¶¶ 17–18, 27; ECF No. 79 at 18. When challenging Murillo's allegations that his experience with administrative segregation amounted to solitary confinement, MTC relies almost exclusively on Casteau's Mental Health Progress notes, only six of which indicate that he had been socializing to any extent with other detainees or family, given access to a television, or participated in religious services. *See* ECF No. 76-1 at 9–10 (not discussing living conditions in SMU); ECF No. 84 at 3 (citing only to Mental Health Progress notes to describe SMU living conditions); ECF No. 76-10 at 2 (February 10, 2020); ECF No. 76-15 at 2 (June 26, 2020 notes), 76-16 at 2 (July 24, 2020 notes), 76-17 at 2 (August 21, 2020 notes; Murillo was able to attend services led by Chaplain, but apparently did not have anyone that shared his faith in the dorm), 76-18 at 2 (September 18, 2020 notes), 76-30 (January 14, 2021 notes). Meanwhile, Murillo provides evidence suggesting that at certain times during his 14-month detainment at the Facility he was isolated even during his recreation time and had severely limited access to the library *See, e.g.*, ECF No. 79-9 at 11–12 (Rodriguez Dep. Tr. 149:13–15, 149:21–150:14); ECF No. 79-14 at 2. He provides government agency reports conducted at the Facility shortly before and contemporaneous to his detention suggesting that his description of the SMU comported with his reality. *See* ECF No. 79-53 at 4, 8–15 (DHS report); ECF No. 79-54 at 77, 82–84, 101–102, 104–109 (Cal DOJ report). Murillo also provides an expert report attesting that the conditions for detainees in the SMU, including for Murillo specifically, violated PBNDS. ECF No. 79-3 at 26–26.

MTC has failed to establish that there is no genuine dispute as to any material fact concerning its conduct as to an IIED claim. MTC provides very little evidence that would

suggest it complied with the PBNDS when it placed Murillo in administrative segregation and kept him there for roughly fourteen months.  Murillo's evidence to the contrary is substantial.  "[R]easonable jurors could find by a preponderance of the evidence that [Murillo] is entitled to" a finding that MTC's conduct was "so extreme as to exceed all bounds of that usually tolerated in a civilized society."  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *Huntingdon*, 129 Cal. App. 4th at 1259.

> ### 2.   Reckless disregard of the probability of causing emotional distress

Murillo asserts that MTC's allegedly outrageous conduct was "taken with reckless disregard for the probability of causing Mr. Murillo emotional distress."  Compl. ¶ 63.  Under this standard, "it is not essential to liability that a trier of fact find a malicious or evil purpose. It is enough that defendant 'devoted little or no thought' to the probable consequences of his conduct."  *KOVR-TV, Inc. v. Superior Court*, 31 Cal. App. 4th 1023, 1031 (1995) (quoting *Miller v. Nat'l Broad. Co.*, 187 Cal. App. 3d 1463, 1487 (1986)); *accord Elena v. Reliance Standard Life Ins. Co.*, No. 21-cv-00390-GPC, 2022 WL 1174107, at *5 (S.D. Cal. Apr. 20, 2022).

While arguing that it did not act with reckless disregard of the probability of causing emotional distress, MTC frames the issue too narrowly.  It suggests that the "outrageous conduct" of which Murillo complains was "MTC's denial of [Murillo]'s request to move to general population after 11 months in protective custody."  ECF No. 76-1 at 11.  However, as discussed above, the outrageous conduct of which Murillo complains was much more expansive and included assigning Murillo to administrative segregation, keeping him there for roughly 14 months, and failing to maintain the conditions required by the PBNDS.  *See* Compl. ¶¶ 17–18, 63, 66.  Keeping Murillo in the SMU even after his written requests to be moved to general population contributes to Murillo's IIED claim, but is not the entire basis of his claim.  Even if the Complaint couched the IIED claim under such narrow conditions, given the allegedly grossly inadequate conditions of the SMU,

reasonable jurors could find by a preponderance of the evidence that MTC acted with reckless disregard of the probability of causing Murillo emotional distress when it chose to keep him in the SMU for roughly three more months after his November 2020 written requests to be moved to general population.[20]

Reasonable jurors could also find by a preponderance of the evidence that MTC acted with reckless disregard of the probability of causing Murillo emotional distress for the majority—or possibly even the entirety—of Murillo's detention.  Without citation to the record, MTC argues that "MTC staff at the Facility did not disregard [Murillo]'s mental health . . . as he received monthly mental health treatment sessions with a licensed professional and received regular, if not daily, access to recreation, socialization, employment, education, and religious services."  ECF No. 76-1 at 11.  But as discussed above, the sufficiency of these monthly mental health treatment sessions[21] and the conditions of Murillo's detention are at least disputed.

Furthermore, absent any complaints from Murillo, a juror could reasonably find that MTC should have had constructive, if not actual, notice of the probable consequences from keeping Murillo in administrative segregation under the conditions he has alleged.  The PBNDS is clear that administrative segregation—with "programs, services, visitation, counsel, and other services" accessible "to the maximum extent possible" to what is

---

[20] MTC points to the fact that Murillo stopped filing grievances and requests to move to general population as support that it did not act outrageously and with reckless disregard toward Murillo's mental health.  ECF No. 76-1 at 11.  This argument is borderline specious given that he was warned on November 20, 2020 that because the Facility had already "addressed" his grievance regarding housing, the "continued filing of grievances of the same issue may be considered frivolous and an abuse of the grievance system."  ECF No. 79-20 at 2.

[21] MTC suggests that Murillo and Casteau "had a quality trust relationship, and [Murillo] would tell her jokes and engage with [Casteau] outside of their treatment sessions," ECF No. 76-1 at 11, but relies only on an irrelevant declaration by MTC's Vice President which makes no mention of Casteau, *see* ECF No. 76-32 at 2–3.

available to detainees in general population, PBNDS § 2.12(V)(A)(1)(c)(9)—should only be used for detainees in protective custody when necessary and when "no reasonable alternatives are available," PBNDS § 2.12(II)(4). Murillo's experts submitted reports "summariz[ing] a large body of research on the psychological effects of solitary confinement," *see* ECF No. 79-6 at 6–8 (Kupers report), and explaining that the harms from administrative segregation are both "well-documented and well-known," and a "major factor behind" amendments to the PBNDS, *see* ECF No. 79-3 at 16–19 (Hansen report). Finally, a jury could find that the DHS report placed the Facility on actual notice that its violations of the PBNDS regarding the conditions and use of administrative segregation were likely to cause its detainees emotional distress. *See* ECF No. 79-53 at 8–10 (finding that the Facility "held detainees in administrative segregation for prolonged periods, under excessively restricted conditions, and without adequate medical checks," and warning that "[d]etainee mental health may be negatively affected by placement in solitary cells with limited recreation and no access to group activities").

MTC has failed to demonstrate that there is an absence of any genuine issue of material fact concerning whether MTC acted with reckless disregard to Murillo's mental health. Murillo provides sufficient evidence such that "reasonable jurors could find by a preponderance of the evidence that [Murillo] is entitled to" a finding that MTC acted with reckless disregard of causing Murillo emotional distress. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *Huntingdon*, 129 Cal. App. 4th at 1259.

## B. Punitive Damages

MTC argues that Murillo's request for punitive damages fails as a matter of law for three reasons. First, it argues that Murillo cannot recover punitive damages under his first cause of action regarding violations of California Government Code section 7320. ECF No. 76-1 at 12–13. Second and third, it argues that Murillo's claim for punitive damages was not adequately pled because he did not "adequately allege specific facts establishing

corporate leaders at MTC acted with malice, oppression or fraud," *id.* at 13–14, and did not "identify a single officer, director, or managing agent who participated in or ratified conduct constituting malice, oppression or fraud," *id.* at 14.

### 1. Pleading standard for punitive damages

As a preliminary matter, the parties disagree over the applicable pleading requirement for punitive damages.  MTC first cites to California Civil Code section 3294, which states:

> (a) In an action for the *breach of an obligation not arising from contract*, where it is proven by clear and convincing evidence that the defendant has been guilty of *oppression, fraud, or malice*, the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of punishing the defendant.

> (b) An employer shall not be liable for damages pursuant to subdivision (a), based upon acts of an employee of the employer, unless the employer had advance knowledge of the unfitness of the employee and employed him or her with a conscious disregard of the rights or safety of others or authorized or ratified the wrongful conduct for which the damages are awarded or was personally guilty of oppression, fraud, or malice.  With respect to a *corporate employer*, the *advance knowledge and conscious disregard, authorization, ratification or act of oppression, fraud, or malice must be on the part of an officer, director, or managing agent of the corporation*.  (Emphasis added.)

ECF No. 76-1 at 13.  MTC then relies on a 1975 opinion from the California Court of Appeal instructing that when a plaintiff seeks exemplary damages for an intentional wrong, the plaintiff must allege "that the wrong was committed willfully or with a design to injure. When nondeliberate injury is charged, allegations that the defendant's conduct was wrongful, willful, wanton, reckless or unlawful do not support a claim for exemplary damages; such allegations do not charge malice." *G. D. Searle & Co. v. Superior Court*, 49 Cal. App. 3d 22, 29 (1975) (citation omitted).  *See* ECF No. 76-1 at 13.

Murillo responds that federal pleading standards are controlling.  ECF No. 79 at 24.  He points to a persuasive order from this Court which is on point.  *Id.*  The court in *Clark v. Allstate Insurance Co.* correctly stated that "federal courts sitting in diversity must apply state substantive law and *federal* procedural rules."  106 F. Supp. 2d 1016, 1018 (S.D. Cal. 2000).  When state law clashes with federal procedural rules, federal courts are "instructed to apply the Federal Rule."  *Hanna v. Plumer*, 380 U.S. 460, 471 (1965).  The court in *Clark* explained that "Section 3294 provides the governing substantive law for punitive damages," but this "heightened pleading standard irreconcilably conflicts with Rules 8 and 9 of the Federal Rules of Civil Procedure—the provisions governing the adequacy of pleadings in federal court."  106 F. Supp. 2d at 1018.  Rule 8(a) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief; and . . . a demand for the relief sought."  *See also Clark*, 106 F. Supp. 2d at 1018.  Rule 9(b), concerning pleading special matters, instructs that "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally" without "*any* particularity."  *See In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1545 (9th Cir. 1994), *abrogated on other grounds by statute*.

MTC does not directly respond to Murillo's assertion about the pleading standard.  *See* ECF No. 84 at 8–10 (absence).  The Court finds persuasive the reasoning from *Clark* and concludes that Murillo need only comply with federal pleading standards, not heightened state pleading standards.

### 2.    Punitive damages under Cal. Gov. Code § 7320

Next, MTC summarily states that punitive damages under California Civil Code section 3294(b) "are not recoverable for claims arising from contract, as alleged in [Murillo's] first cause of action for violation of Cal. Gov. Code section 7320."  ECF No. 76-1 at 12.  *See* Cal. Civ. Code § 3294(a) (allowing exemplary, or punitive, damages "[i]n an action for the breach of an obligation not arising from contract").  Murillo's first cause

24

of action invokes California Government Code section 7320, *see* Compl. ¶¶ 50–57, which (1) requires that "[a]ny private detention facility operator . . . comply with, and adhere to, the detention standards of care and confinement agreed upon in the facility's contract for operations," and (2) allows "an individual who has been injured by" a tortious action committed by the "private detention facility operator, or agent of a private facility, or person acting on behalf of a detention facility operator," to "bring a civil action for relief," Cal. Gov. Code § 7320(a), (c).  Murillo argues that punitive damages are appropriate under section 7320 because his "claim is *not* a breach of contract claim," but one for tortious conduct.  ECF No. 79 at 23.  MTC does not address this argument in its reply.  *See* ECF No. 84 at 8–10 (absence).

Even though a claim for tortious conduct under California Government Code section 7320 incidentally involves a contractual violation, "punitive damages may [still] be recovered [under California Civil Code section 3294] 'upon a proper showing of malice, fraud, or oppression.' " *Alberts v. Liberty Life Assurance Co.*, 65 F. Supp. 3d 790, 795–96 (N.D. Cal. 2014) (quoting *Schroeder v. Auto Driveaway Co.*, 11 Cal. 3d 908, 921 (1974) (upholding claim for fraud and deceit, even though it pertained to a contract, because it was "actually for the breach of an obligation imposed by law—in which exemplary damages may also be sought")).  Therefore, California Civil Code section 3294 does not preclude, as a matter of law, punitive damages for a tort claim arising under California Government Code section 7320.

### 3.    Malice, oppression, or fraud

MTC next argues that Murillo failed to allege "any conduct constituting malice, oppression or fraud as is required for the imposition of punitive damages."  ECF No. 76-1 at 13 (emphasis removed).  MTC does not argue that there is an absence of evidence supporting that MTC engaged in conduct constituting malice, oppression, or fraud; nor does it argue that there is evidence supporting that MTC did not engage in any such

conduct.  *See id.* (absence); ECF No. 84 at 8–10 (absence).  It only argues that Murillo failed to satisfy the pleading standards.

As explained above, the Federal Rules of Civil Procedure establish the controlling pleading standards.  Rule 9(b) instructs that "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally" without "*any* particularity."  *See In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1545 (9th Cir. 1994), *abrogated on other grounds by statute*.  In relevant parts, California Civil Code section 3294(c) defines "malice" as "despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others," and "oppression" as "despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights."

Murillo's Complaint alleges facts that satisfy both the federal and heightened state pleading standards for punitive damages.  There are allegations that MTC's facility housed Murillo in conditions that amounted to solitary confinement for roughly 14 months, *e.g.*, Compl. ¶¶ 17–18, 23; that other housing options were available but "MTC and its employees refused" Murillo and the administrative segregation detainees these alternatives, Compl. ¶ 20; that Murillo "filed grievances" and made verbal requests asking to be moved and "explaining the toll that months of solitary confinement had taken on him," Compl. ¶ 22; that MTC was on notice that these conditions were unlawful because of its contractual obligation to follow the PBNDS and the two government reports highlighting its failure to comply with the PBNDS, Compl. ¶¶ 25–35; and that "researchers and experts have extensively and empirically documented the psychological pain and emotional damage caused by solitary confinement, and particularly bouts of prolonged isolation," Compl. ¶ 37.  Accepting such factual allegations as true, a reasonable juror could find that there was conduct constituting malice and oppression under California Civil Code section 3294.

### 4.    Identification of an officer, director, or managing agent

Finally, MTC argues that Murillo's request for punitive damages fails as a matter of law because Murillo "has been unable to identify a single officer, director, or managing agent who participated in or ratified conduct constituting malice, oppression or fraud with respect to [Murillo]'s detention or the denial of his request[s] to move to general population." ECF No. 76-1 at 14.  MTC additionally argues that Murillo *cannot* make any such identification because it alleges that "[t]he 'corporate leaders' at MTC do not make, or otherwise ratify, decisions regarding individual detainee's detention or housing." *Id.* MTC supports this statement by pointing to a declaration from Dan Joslin, the Vice President of Corrections Region II with MTC, attesting that "[o]perational decisions regarding individual detainees are made by MTC staff at the facility," not "[c]orporate leaders at MTC" and that no MTC corporate leaders "made or consulted on any decisions regarding [Murillo]'s detention." ECF No. 76-32 at 3.  This declaration does not explicitly mention the ratification factor.  Without citation to the record, MTC asserts that "discovery has demonstrated that no officer, director, or managing agent was involved in or ratified any decisions regarding [Murillo]'s detention or his request to move." ECF No. 76-1 at 14.

Murillo responds "that at least three managing agents (Warden Sixto Marrero, Deputy Warden Edward Ruiz, and Compliance Manager Brian Robinson) engaged in, authorized, or ratified conduct constituting malice, oppression, or fraud." ECF No 79 at 25–26.  Murillo argues that these men, as the Facility's warden, deputy warden, and compliance manager, "exercised substantial discretionary authority over significant aspects of [MTC]'s business" such that they constituted managing agents.  *Id.* at 26 (quoting ECF No. 79-1 at 25 (AMFs 49–51)).  MTC disagrees, arguing that there is no "evidence establishing that these individual staff members 'determine corporate policy' as is required for the imposition of punitive damages." ECF No. 84 at 9.  MTC does not deny

27

that Marrero, Ruiz, or Robinson exercised substantial discretionary authority over significant aspects of MTC's business, just that they did not influence corporate policy. *See* ECF No. 84 at 9–10.

A "managing agent" under California Civil Code section 3294 must "be someone who 'exercise[s] substantial discretionary authority over decisions that ultimately determine corporate policy.' " *Roby v. McKesson Corp.*, 47 Cal. 4th 686, 714 (2009) (quoting *White v. Ultramar, Inc.*, 21 Cal. 4th 563, 566–67 (1999)). *Roby* further clarified the rule from *White* which had required that a managing agent have "discretionary authority over corporate policy": this refers "to formal policies that affect a substantial portion of the company and that are the type likely to come to the attention of corporate leadership." *Roby*, 47 Cal. 4th at 714–15 (quoting *White*, 21 Cal. 4th at 577). "If there exists a triable issue of fact regarding whether a corporate employee is a managing agent under the *White* test, that factual question must be determined by the trier of fact and not the court on a motion for summary adjudication." *Davis v. Kiewit Pac. Co.*, 220 Cal. App. 4th 358, 366 (2013).

Murillo has presented evidence that Marrero, Ruiz, and Robinson all exercised substantial discretionary authority over decisions that ultimately determine corporate policy. Ruiz was purportedly in charge of many "departments ranging from detention, food service, religious services, recreation, education, training, maintenance, [and] operations." ECF No. 79-28 at 8 (Ruiz Dep. Tr. 11:19–22). MTC's Vice President of Corrections Region II confirmed via declaration that "MTC staff at the facility" make the operational decisions, including regarding Murillo's detention. ECF No. 76-32 at 3. And both Ruiz and Marrero were members of the SMU Committee involved in placing detainees in protective custody or returning them to general population. ECF No. 79-28 at 9 (Ruiz Dep. Tr. 42:8–24); *see also* ECF No. 79-57 at 7 (Builteman Dep. Tr. 59:6–23). And Robinson, as Compliance Manager, would have purportedly been involved in setting

1    up policies to comply with the PBNDS.  *See* ECF No. 79-55 at 9–10 (Robinson Dep. Tr.

2    58:14–59:14).

3          Murillo further argues, and points to evidence tending to support, that at least Ruiz

4    and Robinson were aware of the harms Murillo was likely to face due to the conditions of

5    his detainment and that they disregarded the risks, constituting malice.  ECF No. 79 at 28–

6    29; *see* ECF No. 79-56 at 11 (Robinson Dep. Tr. 129:1–21) (disagreeing with December

7    2020 DHS report findings); ECF No. 79-28 at 18–21 (Ruiz Dep. Tr. 174:6–177:5)

8    (discussing government reports and that Ruiz did not recall whether the Facility or MTC

9    made any changes in response to report).  This evidence, especially when considered in

10   light of the evidence discussed above regarding Murillo's IIED claims, raises a genuine

11   issue of fact regarding Marrero's, Ruiz's, and Robinson's authority over decisions that may

12   determine company policy, and could permit a reasonable factfinder to conclude they

13   engaged in, authorized, or ratified malicious or oppressive conduct.  *See also Webb v. Geo*

14   *Grp., Inc.*, No. cv 16-02747-BRO, 2017 WL 11636422, at *21–22 (C.D. Cal. Mar. 22,

15   2017) (concluding warden of detention facility owned by defendant corporation could

16   constitute "managing agent").[22]  This evidence could similarly support a finding "that

17   within the corporate hierarchy authorized persons acted despicably in 'willful and

18   conscious disregard of the rights of safety of others,' " such that a corporate policy to that

19   effect was formulated and Murillo did not need to identify one particular "managing agent"

20   with the requisite state of mind.  *See Lannes v. CBS Corp.*, No. CV 12-1876 PA, 2013 WL

21   12125425, at *5 (C.D. Cal. July 3, 2013) (*quoting Romo v. Ford Motor Co.*, 99 Cal. App.

22

23

24   _____

25   [22] MTC argues that *Webb* is distinguishable from this case because it was an employment case.  ECF No.
     84 at 9–10.  However, *Webb* remains persuasive because it is discussing the definition of "managing
26   agent" within the scope California Civil Code section 3294.  *See Webb*, 2017 WL 11636422, at *21–22.
     MTC does not explain why the definition would be any different under the present facts.

27                                          29

28                                                                    21-CV-1770-GPC-LR

4th 1115, 1139–40 (2002), *vacated and remanded on other grounds, by Ford Motor Co. v. Romo*, 538 U.S. 1028 (2003)).

There remains a genuine dispute of material facts concerning whether Murillo may be entitled to punitive damages.

## V.   CONCLUSION

For the reasons explained above, MTC's Motion for Partial Summary Judgment on Murillo's claim for intentional infliction of emotional distress and request for punitive damages is DENIED.

**IT IS SO ORDERED.**

Dated:  April 19, 2023

Hon. Gonzalo P. Curiel
United States District Judge

30